[No. 18681-4-III.  Division Three.  August 1, 2000.]

JERRY OVERTON, ET AL., *Appellants*, v. CONSOLIDATED INSURANCE COMPANY, ET AL., *Respondents*.

*R.M. Etter, Jr.* (of *Witherspoon, Kelley, Davenport & Toole, P.S.*); and *Michael R. Wrenn* and *Robert D. Leinbach* (of *Heller Ehrman White & McAuliffe*), for appellants.

*Russell C. Love* (of *Thorsrud Cane & Paulich, Inc., P.S.*); and *David M. Jacobi* (of *Wilson, Smith, Cochran & Dickerson*), for respondents.

SWEENEY, J. — We are again presented with the question of whether placement of a pollutant (here PCBs) falls within the comprehensive general liability policy definition of an "occurrence."

Insurance coverage for property damage secondary to pollutants depends on whether the insured expected or intended the damage. In 1976, the Department of Ecology (Ecology) informed the owners of Spokane Transformer Company of the presence of PCBs on their property. They and their successors bought comprehensive general liability policies in 1977 and 1979. The question presented is whether the insureds' knowledge of the presence of PCBs on the property was a known risk and, therefore, fell outside the policy definition of an "occurrence."

We conclude that a question of fact remains on whether the damage here was expected or intended. We do so based primarily on the holding in *Queen City Farms, Inc. v. Central National Insurance Co.*[1] We also conclude that the insurance companies had an obligation to defend but that their refusal to do so did not amount to bad faith given the coverage question. We, accordingly, reverse the trial court's summary dismissal of Spokane Transformer's complaint.

## FACTS

From 1961 to 1980, Richard Boyce owned the property where Spokane Transformer Company was located. He owned and operated Spokane Transformer until 1972. The company repaired and manufactured electrical transformers. From 1972 to 1979, Jerry Overton leased the property and owned and operated the company. Paul and Mary Ann Gisselberg bought the property in 1981.

---

[1] 126 Wn.2d 50, 882 P.2d 703, 891 P.2d 718 (1994).

In 1977, Industrial Indemnity Insurance Company of the Northwest issued a comprehensive general liability (CGL) insurance policy naming Mr. Overton, Mr. Boyce and Spokane Transformer as insureds. (We refer to the insureds collectively as Spokane Transformer.) That policy was in effect until July 20, 1980. The Consolidated Insurance Company policy was in effect from July 25, 1979 to July 25, 1982.

Both policies contain standard CGL legalese.[2] They promise to pay "all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence . . . ." They also agreed to defend "any suit against the insured seeking damages on account of such . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient . . . ."

Both policies define "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in . . . property damage neither expected nor intended from the standpoint of the insured."

Both policies exclude coverage for:

property damage arising out of the discharge, dispersal, release or escape of . . . toxic chemicals . . . or pollutants into or upon land . . . [unless] such discharge, dispersal, release or escape is sudden and accidental.

PCB Pollution. In 1976, Environmental Protection Agency (EPA) inspectors took two soil samples at Spokane Transformer and found some PCB contamination in one of them. Ecology reported these findings to Mr. Overton. He was hostile and uncooperative with the agents. Ecology dropped the matter. It did no further investigation to

---

[2] Irene A. Sullivan & William J. Wright, Jr., *Hazardous Waste Litigation: CGL Insurance Coverage Issues, in* INSURANCE, EXCESS, AND REINSURANCE COVERAGE DISPUTES 1989, at 387, 399 (PLI Litig. & Admin. Practice Course Handbook Series No. 369, 1989).

determine the extent of the contamination and took no enforcement action.

The EPA inspected again in 1980. "[O]il-stained soils were observed, but no samples taken." The EPA tested again in 1985. Neither Ecology nor the EPA knew at that time whether the level of contamination would require cleanup. The EPA recommended that the extent of soil contamination be determined and "potential removal actions for contaminated soil" be considered. However, Ecology took no action. The EPA looked at the site yet again in 1987.

The EPA informed the Gisselbergs in 1992 that there was no contamination problem at the site. The notes of a 1994 meeting with Mr. Gisselberg end with the notation, "Not a priority for Ecol." The Gisselbergs discovered PCB contamination in excess of Ecology's mandatory cleanup levels in 1994. They informed Ecology. On August 28, 1997, the EPA reported to Ecology:

> EPA last looked at site around 1987. Decision at that time was that there would be no removal/follow-up on it at all.
>
> EPA has no interest in the site at this point.
>
> Nothing is planned unless something major has changed and need to look at it again.

The Gisselbergs nevertheless cleaned up the site. They notified Mr. Overton in 1994 that they would seek contribution for the cleanup. Mr. Overton notified the insurers in October 1994. The insurers investigated under a reservation of rights. The Gisselbergs' engineer estimated the contribution of each insured would be $4,250. Mr. Overton claimed he manufactured only new, oil-filled transformers, and denied ever handling PCBs.

PROCEDURAL HISTORY

In December 1994, the Gisselbergs filed suit against Spokane Transformer under the Model Toxics Control Act, ch. 70.105D RCW. They sought cleanup costs for PCBs alleged to have been released between 1972 and 1979.

Spokane Transformer tendered its defense to both insurance companies. Both companies denied coverage. And both refused to defend.

Spokane Transformer sued the insurers for breach of contract, bad faith, and Consumer Protection Act (CPA) violations. The insurers moved for summary judgment, contending Mr. Overton's knowledge of the contamination precluded coverage because he failed to disclose a known risk. The trial court first ruled in favor of the insurers because Mr. Overton knew about the contamination before taking out the policies. The court then reconsidered and concluded that issues of fact remained as to what Mr. Overton knew and when. Ultimately, the court dismissed all of Spokane Transformer's claims with prejudice, ruling there was no "occurrence" as a matter of law, no bad faith refusal to defend, and no CPA violation.

Spokane Transformer appeals, contending the court's rulings are inconsistent.

## ANALYSIS

Interpretation of an insurance policy is a question of law. We construe the policy as a whole and give force and effect to each clause. *Public Util. Dist. No. 1 v. International Ins. Co.*, 124 Wn.2d 789, 797, 881 P.2d 1020 (1994). The policy's language should receive a "fair, reasonable, and sensible construction," such as the average person buying insurance would give it. *Queen City Farms, Inc. v. Central Nat'l Ins. Co.*, 126 Wn.2d 50, 65, 882 P.2d 703, 891 P.2d 718 (1994). Insurance coverage in environmental claims is highly jurisdiction-specific. *Id. Queen City Farms* is the leading case in Washington. It interprets the standard clauses at issue here, including the meaning of "occurrence."

### OCCURRENCE

The Gisselbergs' underlying claim is that they suffered property damage in the form of cleanup costs because

Spokane Transformer deposited PCBs during the policy period. Spokane Transformer notes that an "occurrence" turns on whether the damage was expected or intended by the insured. It argues that the Gisselbergs' cleanup costs constitute the damage here that triggers coverage unless Spokane Transformer intended or expected this particular loss. *Queen City Farms*, 126 Wn.2d at 76.

The insurers respond that the "liability" insured against in a CGL policy is something other than legal liability for the loss. They contend that the dispositive event was the contamination of the site with PCBs. And Spokane Transformer knew about this because the EPA notified Mr. Overton of it in 1976. The insurers cite *Time Oil*[3] for the proposition that coverage is automatically excluded whenever Ecology informs an insured that a hazardous substance is present.

*Time Oil* is distinguishable. In that case, the policy was written after the EPA had identified spread of the contamination to the city aquifer. And Ecology had officially notified the insured it was a potential responsible party, triggering strict liability under federal hazardous waste regulations. *Time Oil*, 743 F. Supp. at 1404.

■ The Spokane Transformer policies define an "occurrence" as continuous or repeated exposure to conditions which results in property damage neither expected nor intended from the standpoint of the insured. The phrase "neither expected nor intended" modifies "property damage," not "exposure." It describes the subjective state of mind of the insured with respect to the property damage— here the cost of cleaning up the property of third parties. *Queen City Farms*, 126 Wn.2d at 69. The policies contained the standard exclusion for damage to the insured's own property.[4] Property means the property of third parties.

---

[3] *Time Oil Co. v. Cigna Property & Cas. Ins. Co.*, 743 F. Supp. 1400 (W.D. Wash. 1990).

[4] Coverage excludes damage to "(1) property owned or occupied by or rented to

Ecology told Spokane Transformer that the EPA had found a contaminated soil sample, and recommended that it investigate the extent of the pollution and clean it up if necessary. Ecology never notified Spokane Transformer it was a potential responsible party under the Model Toxics Control Act—at least on this record. That official notification is a prerequisite for statutory strict liability. RCW 70.105D.050(1). As late as 1994, the extent of the pollution was still undetermined. Neither the EPA nor Ecology believed the site was a problem. An invitation by Ecology to initiate cleanup is not enough to create strict liability. *Weyerhaeuser Co. v. Aetna Cas. & Sur. Co.*, 123 Wn.2d 891, 902, 874 P.2d 142 (1994).

■ Whether Spokane Transformer had the requisite expectation or intent of the particular loss so as to disqualify coverage is a question for the trier of fact. *Public Util. Dist.*, 124 Wn.2d at 805-06.

### DUTY TO DEFEND

Spokane Transformer contends that the duty to defend is triggered whenever there is any *potential or possibility* of coverage for the underlying claims against the insured. *Time Oil*, 743 F. Supp. at 1419-20. So here the duty to defend was triggered by the Gisselbergs' complaint.

■ ■ The duty to defend is broader than the duty to indemnify. *Baugh Constr. Co. v. Mission Ins. Co.*, 836 F.2d 1164, 1168 (9th Cir. 1988) (applying Washington law). The duty to defend is triggered by the filing of a complaint against the insured alleging facts which, if proved, will potentially trigger the duty to indemnify under the policy. *Id.* at 1168; *Weyerhaeuser*, 123 Wn.2d at 902. The insurer need not look beyond the face of the complaint if the complaint filed against the insured is unambiguous. *R.A. Hanson Co. v. Aetna Ins. Co.*, 26 Wn. App. 290, 296, 612 P.2d 456 (1980) (coverage was for malicious prosecution, com-

---

the insured, (2) property used by the insured, or (3) property in the care, custody or control of the insured . . . ."

plaint was for abuse of process—no duty to look beyond face of complaint). Only if the complaint alleges liability that is clearly not covered by the policy or falls unequivocally within an exclusion is the duty to defend excused. *Baugh*, 836 F.2d at 1168. The burden is on the plaintiff to show that the loss suffered is covered by the policy. *Waite v. Aetna Cas. & Sur. Co.*, 77 Wn.2d 850, 853, 467 P.2d 847 (1970).

Here, the Gisselbergs' complaint alleged that PCBs were deposited in the soil during the coverage period, and that Spokane Transformer is strictly liable for the cleanup costs by statute. These are facts which, if proved, will trigger the duty to indemnify. The filing of the complaint, therefore, triggered the duty to defend. *Baugh*, 836 F.2d at 1168.

### BAD FAITH AND CPA CLAIMS

■ Insurers have a statutory duty of good faith. RCW 48.01.030. The insurer's duty of good faith is based on a fiduciary relationship which involves more than the usual "honesty and lawfulness of purpose" which constitutes the standard definition of good faith. "It implies 'a broad obligation of fair dealing,' and a responsibility to give 'equal consideration' to the insured's interests." *Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 385-86, 715 P.2d 1133 (1986) (citation omitted). Good faith by an insurer is a question of fact. *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 395, 823 P.2d 499 (1992). Summary judgment may be appropriate, however, if reasonable minds could reach only one conclusion. *Briscoe v. Travelers Indem. Co.*, 18 Wn. App. 662, 667, 571 P.2d 226 (1977) (not bad faith to refuse to defend intentional assault claim under personal injury accident policy).

■ An insurer breaches its duty if it acts without reasonable justification in handling a claim. *Villella v. Public Employees Mut. Ins. Co.*, 106 Wn.2d 806, 821, 725 P.2d 957 (1986). But denial of coverage based on a reasonable interpretation of the policy is not bad faith. *Id.* Spokane Transformer contends the failure to defend was un-

reasonable and, therefore, gave rise to a valid bad faith claim under the CPA. *Transcontinental Ins. Co. v. Washington Pub. Utils. Dists.' Util. Sys.*, 111 Wn.2d 452, 470, 760 P.2d 337 (1988).

██ ██ To prevail in a CPA action, the plaintiff must establish that the defendant has engaged in an "unfair or deceptive" act or practice occurring in trade or commerce that impacts the public interest and causes the plaintiff injury in his or her business or property. RCW 19.86.020; *Industrial Indem. Co. of the N.W., Inc. v. Kallevig*, 114 Wn.2d 907, 920-21, 792 P.2d 520, 7 A.L.R.5th 1014 (1990). The bad faith breach of the duty to defend constitutes a per se violation of the "unfair or deceptive acts or practices" of the CPA. *Salois v. Mutual of Omaha Ins. Co.*, 90 Wn.2d 355, 359, 581 P.2d 1349 (1978).

██ We will not find bad faith where the legal sufficiency of the insurer's reasons for denying coverage is unclear. *Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 155, 930 P.2d 288 (1997); *Washington Pub. Utils. Dists.' Util. Sys.*, 111 Wn.2d at 470.

Spokane Transformer's tender of defense triggered a duty to defend. The allegations set out in this complaint arguably placed the loss within the terms of the policy. However, the coverage questions raised by the insurance companies are reasonable given the EPA's notice to Mr. Overton in 1976—or, at least, not so unreasonable as to amount to bad faith.

## ATTORNEY FEES

Spokane Transformer claims fees and costs under *Olympic Steamship Co. v. Centennial Insurance Co.*, 117 Wn.2d 37, 811 P.2d 673 (1991). If it prevails on remand, it is entitled to fees.

The summary judgment of the trial court is reversed.

BROWN, A.C.J., and KATO, J., concur.

Reconsideration denied November 3, 2000.

Review granted at 134 Wn.2d 1008 (2001).