38 P.3d 322 (2002)
Jerry OVERTON f/d/b/a Spokane Transformer Company; and Richard Boyce, Respondents,
v.
CONSOLIDATED INSURANCE COMPANY, an Indiana Corporation, Petitioner,
and Industrial Indemnity Insurance Company of the Northwest, a Washington corporation, Defendant.
No. 70562-3.
Supreme Court of Washington, En Banc.
Argued May 30, 2001.
Decided January 17, 2002.
*323 Wilson, Smith, Cochran, Dickerson, David Michael Jacobi, Seattle, for Indemnity Insurance Company.
Thorsrud, Cane & Paulich, Russell Charles Love, Seattle, for Petitioners.
Heller, Ehrman, White & McAuliffe, Michael Richard Wrenn, Seattle, for Plaintiff Boyce.
Witherspoon, Kelley, Davenport & Toole, R. Max Etter, Spokane, Heller, Ehrman, White & McAuliffe, John Matthew Geyman, Michael Richard Wrenn, Seattle, for Respondents.
SANDERS, J.
This proceeding arises out of two comprehensive general liability policies purchased on behalf of an electrical transformer manufacturing and repair business. After suit was commenced by the current owners of the site for contribution of cleanup costs under the Model Toxics Control Act, chapter 70.105D RCW, the insureds tendered defense to their insurers. When both insurers rejected the tender, the insureds sued, claiming breach of contract, bad faith denial of coverage, and violation of the Consumer Protection Act, chapter 19.86 RCW. The ultimate question is whether an existing contamination of the insured's property known by the insured prior to purchasing an insurance policy, but which results in liability to a third party subsequent to the purchase, is an "occurrence" triggering coverage. We conclude it is not.

*324 I
This proceeding has a long and colorful history, involving, among other things, toxic chemicals and politicians. Beginning in 1961, the Spokane Transformer Company operated an electrical transformer manufacturing and repair facility located in Spokane, Washington. Spokane Transformer used various hazardous materials in its operations, including polychlorinated biphenyls (PCB). The initial owner of this business was Richard Boyce, who sold it to Jerry Overton in 1972. Overton continued operating the electrical transformer business for another couple of years, leasing the underlying property from Boyce.
In 1976, Environmental Protection Agency (EPA) inspectors took two soil samples from the Spokane Transformer site. Test results revealed elevated levels of PCB contamination in one of those samples. When Department of Ecology (DOE) regulators informed Overton of the test results, he acknowledged oil-filled transformers were made on the site, but denied the use of any fluids containing PCB. According to a DOE report on the visit, Overton's position was that there was no problem and that, even if the soil were contaminated, it was not his responsibility to clean it up. Although the EPA recommended the Spokane Transformer site be inspected further to determine the extent of PCB contamination, no further action was taken.
The following year, 1977, Spokane Transformer purchased a comprehensive general liability (CGL) policy from Industrial Indemnity Company. The policy named Spokane Transformer, Overton, and Boyce as insureds. Two years later in 1979, Spokane Transformer purchased another CGL policy from Consolidated Insurance Company with the same insureds. (Since these policies both originate out of Spokane Transformer and have the same named insureds, we refer to the insureds collectively as Spokane Transformer.) The Industrial policy expired in 1980, while the Consolidated policy ran until 1982. Meanwhile, Spokane Transformer ceased operations and was liquidated in 1979. There is no evidence Spokane Transformer informed either Industrial or Consolidated about the EPA test results when the policies were purchased.
The property upon which the Spokane Transformer facility had been located was eventually purchased by Paul and Mary Ann Gisselberg in 1981. Some years after the purchase, they conducted their own environmental audit of the property as part of a refinancing arrangement and discovered the preexisting PCB contamination.
The Gisselbergs initiated remedial measures to clean up the property, and sent Overton, now a member of the Arizona House of Representatives, a demand letter notifying him they would seek contribution from him as a "potentially liable person" under the Model Toxics Control Act, chapter 70.105D RCW. Overton forwarded the demand letter to Consolidated and Industrial, which proceeded to investigate the claim. Meanwhile, the Gisselbergs filed their suit against Overton and Boyce for contribution toward the cleanup cost. When Overton and Boyce tendered defense of the action to Industrial and Consolidated, both insurers rejected the tender asserting: (1) the claim was a known loss; (2) previously known and existing damage could not be a covered "occurrence"; (3) the pollution exclusion applied because release of the pollutants was expected; and (4) the owned-property exclusion applied.
The underlying Gisselbergs suit eventually spawned the coverage litigation before us. These proceedings began in 1998 when Spokane Transformer sued Consolidated and Industrial for breach of contract, bad faith, and violation of the Consumer Protection Act. The insurers moved for summary judgment and the trial court ultimately granted the motion dismissing all claims. In so doing the court ruled there was neither a covered "occurrence" under the policy nor evidence of bad faith or violation of the Consumer Protection Act.[1] Upon the insureds' appeal, the Court of Appeals reversed on the coverage *325 issue, holding a question of fact remained as to whether a covered "occurrence" had taken place. Overton v. Consolidated Ins. Co., 101 Wash.App. 651, 659, 6 P.3d 1178 (2000). But the court affirmed the holdings that Consolidated and Industrial did not act in bad faith or otherwise violate the Consumer Protection Act by rejecting the tender. Id. at 661, 6 P.3d 1178.
Both sides appealed the Court of Appeals' decision. Consolidated seeks review of the reinstatement of the coverage claim. Spokane Transformer seeks review of the bad faith and Consumer Protection Act claims. Industrial has not joined Consolidated's petition, but opposed review of Spokane Transformer's claims. We granted review. 143 Wash.2d 1008, 21 P.3d 291 (2001).
The questions we must decide are (1) whether Spokane Transformer's knowledge of PCB contamination prior to the purchase of the insurance policies precludes coverage; and (2) whether the insurers acted in bad faith or in violation of the Consumer Protection Act when they rejected Spokane Transformer's tender.

II
The outcome of this case depends on a proper interpretation of the insurance policies issued by Consolidated and Industrial. Interpretation of insurance policies is a question of law, in which the policy is construed as a whole and each clause is given force and effect. Pub. Util. Dist. No. 1 v. Int'l Ins. Co., 124 Wash.2d 789, 797, 881 P.2d 1020 (1994). The terms of a policy should be given a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." Sears v. Grange Ins. Ass'n, 111 Wash.2d 636, 638, 762 P.2d 1141 (1988) (citing E Z Loader Boat Trailers, Inc. v. Travelers Indem. Co., 106 Wash.2d 901, 907, 726 P.2d 439 (1986)).

A
For coverage under the type of CGL policy at issue here, an insured must show some form of harm caused by an "occurrence." Queen City Farms, Inc. v. Cent. Nat'l Ins. Co., 126 Wash.2d 50, 70-71, 882 P.2d 703, 891 P.2d 718 (1994). The Consolidated CGL insurance policy provides:
The company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of
Coverage A. bodily injury, or
Coverage B. property damage
to which this insurance applies, caused by an occurrence....
Clerk's Papers (CP) at 295. The critical terms for our consideration are "occurrence," "property damage," and "damages." The two former are defined in the policy:
"occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;
....
"property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period[.]
CP at 296.
Thus, the plain language of the policy covers only (i) accidents which, (ii) during the policy period, (iii) result in property damage (iv) that is neither expected nor intended (v) from the standpoint of the insured.
To be an "occurrence," a harmful event must be "neither expected nor intended from the standpoint of the insured." CP at 296. The Court of Appeals properly recognized this clause describes "the subjective state of mind of the insured with respect to the property damage." Overton, 101 Wash. App. at 658, 6 P.3d 1178. In other words, property damage that is expected or intended by the insured does not warrant coverage. Queen City Farms, Inc., 126 Wash.2d at 70-71, 882 P.2d 703.
In Time Oil Co. v. Cigna Property & Casualty Insurance Co., the court, applying *326 Washington law, held the risk of liability was no longer unknown when the insured received notice indicating a "substantial probability" the loss would occur. 743 F.Supp. 1400, 1414-15 (W.D.Wash.1990). The Court of Appeals distinguished Time Oil based on an official EPA notice to the insured of its status as a potentially responsible party. Overton, 101 Wash.App. at 659, 6 P.3d 1178 (citing Time Oil Co., 743 F.Supp. at 1404). Undeniably, there was no such official notification of liability here. The Court of Appeals went on to state that such an official notification is a prerequisite for statutory strict liability under the Model Toxics Control Act as a potential responsible party. Overton, 101 Wash.App. at 658, 6 P.3d 1178 (citing RCW 70.105D.050(1)). Be that as it may, whether Overton was a potential responsible party is not the issue here; the issue is whether Spokane Transformer knew of the loss prior to purchasing the insurance.
Time Oil holds, for purposes of determining whether the property damage is expected by the insured, the insured merely must be put on notice. See City of Okanogan v. Cities Ins. Ass'n, 72 Wash.App. 697, 703, 865 P.2d 576 (1994). "[I]f an event causing loss is not contingent or unknown prior to the effective date of the policy, there is no coverage." Id. at 701, 865 P.2d 576. The dispositive issue is not how the insured was notified of property damage, but whether the insured had such notice prior to purchasing the policy. Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 8.02[c] (10th ed. 1999) (citing numerous cases, including Time Oil); see also Town of Tieton v. Gen. Ins. Co. of Am., 61 Wash.2d 716, 724, 380 P.2d 127 (1963).
To support their claim of coverage Spokane Transformer seeks refuge in Gruol Construction Co. v. Insurance Co. of North America, 11 Wash.App. 632, 524 P.2d 427 (1974). However, the case before us is not a situation involving the continuing process of unexpected, unintended damage, as was the case in Gruol. The damage at issue in Gruol was dry rot caused by earth being pushed against exposed wood during a construction project. Id. at 633, 524 P.2d 427. Due to construction the insured had no knowledge of the defective condition. Id. at 635. Gruol recognized this damage was not foreseeable from the insured's standpoint because under those circumstances dry rot is an invisible, slow process. Id. at 633, 524 P.2d 427. As such, the harm was an occurrence covered by the liability insurance. Id. Gruol stands for the proposition that excusable ignorance of a preexisting property damage does not necessarily preclude coverage.
Under some circumstances PCB contamination may very well be the kind of invisible, slow process that leads to an unexpected and unintended damage. But here the facts are different. In this situation the insureds knew of the contamination, and the process was not invisible from their standpoint. Had Spokane Transformer not been made aware of the presence of PCB, perhaps there would have been excusable ignorance under Gruol. But since the record shows Spokane Transformer had notice of the defective condition, i.e., the PCB contamination, before purchasing the insurance policy, Gruol offers no relief.
The parties disagree on what must be unexpected for coverage to be triggered. Consolidated argues coverage is specifically limited to "property damage," defined as physical injury to tangible property. To trigger coverage a physical injury must have been unexpected from the standpoint of Spokane Transformer. As the argument goes, the physical property damage here stemmed from the PCB contamination of which Spokane Transformer was aware since at least 1976. This property damage was therefore not unexpected, taking this claim outside the "occurrence" definition.
Spokane Transformer argues the unexpected harmful event that is covered by the policy is the third party property damages, i.e., the costs of cleanup resulting from the Gisselbergs' suit for contribution. Pointing out the policy is one protecting against third party liability, Spokane Transformer maintains the harm insured against is not the occurrence of a harmful event itself, but the insured's legal obligation to pay for damages arising from that event. But this argument directly contradicts the plain language of the insurance contract.
*327 The Court of Appeals' decision on the coverage issue is also the result of an unexplained departure from the plain language of the policy. Both Spokane Transformer and the Court of Appeals fail to recognize the policy defines "property damage" as "physical injury to or destruction of tangible property." CP at 296. Courts interpreting insurance policies should be bound by definitions provided therein. Kitsap County v. Allstate Ins. Co., 136 Wash.2d 567, 576, 964 P.2d 1173 (1998). Here, however, the Court of Appeals provided its own definition of "property damage" as being "the cost of cleaning up the property of third parties." Overton, 101 Wash.App. at 658, 6 P.3d 1178.
The meaning of "property damage" is critical to determine whether there was an "occurrence" here. Simply put, because the Court of Appeals phrased this question incorrectly, it arrived at the wrong conclusion. Under the language of the policy, the proper question is whether Spokane Transformer expected the property damage that eventually resulted in the cost of cleaning up the Gisselbergs' property. Instead, the Court of Appeals asked whether Spokane Transformer expected or intended the cost itself.
The Court of Appeals seemingly confused the concept of "property damage" with that of "damages." The difference may seem miniscule, but the impact on the outcome of this case cannot be overstated. Although the policy provides the insurer must pay out the amount "the insured shall become legally obligated to pay as damages," it does not define "damages." Undefined terms in an insurance contract are given "plain, ordinary, and popular meaning" as set forth in standard English language dictionaries. Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wash.2d 869, 877, 784 P.2d 507 (1990). In Boeing, for example, we explained the term "damages" in an insuring agreement refers to the cost of compensating a claimant for damage done to the property. Id. (citing Webster's Third New International Dictionary 517 (1971)). This is vastly different from "property damage," which is defined by the policy as "physical injury to or destruction of tangible property." CP at 296.
It follows that "damage" must be distinguished from "damages." See Am. Stevedores v. Porello, 330 U.S. 446, 450 n. 6, 67 S.Ct. 847, 91 L.Ed. 1011 (1947). "Damage" means the actual loss, injury, or deterioration of the property itself. Id. "Damages," on the other hand, means compensating loss or damage. Id.

B
The question remains whether the trial court erred in granting summary judgment on the coverage issue. The starting point is whether there was an "occurrence." This is in turn determined by whether Spokane Transformer expected or intended the "property damage" that eventually resulted in damages in the form of cleanup costs to the Gisselbergs. The controlling definition of "property damage" is the one provided by the insurance policy: "physical injury to or destruction of tangible property." CP at 296; Kitsap County, 136 Wash.2d at 576, 964 P.2d 1173.
Summary judgment orders are reviewed de novo and affirmed "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c); Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982). A motion for summary judgment will be granted only if, after considering the evidence in the light most favorable to the nonmoving party, "reasonable persons could reach but one conclusion." Reynolds v. Hicks, 134 Wash.2d 491, 495, 951 P.2d 761 (1998) (citing Wilson, 98 Wash.2d at 437, 656 P.2d 1030).
The EPA claims it notified Overton of the presence of PCB in the property in 1976, and authenticated reports support this. Overton knew Consolidated denied his claim based on the information in the EPA documents. In addition, he was repeatedly invited to submit information that might change Consolidated's decision. Yet, Overton did not dispute the EPA's claimat least not initially. His initial testimony was that he did not remember *328 the EPA visit, not that it did not occur. At his deposition and in the proceeding on Consolidated's first summary judgment motion, Overton stated he had no recollection of the visit. Then, in response to Consolidated's renewed motion for summary judgment, he offered a conclusory statement that he has no recollection of the visits and, therefore, they must not have occurred.
Overton's prior deposition testimony states:
Q: Is it your testimony that on April 15, 1976 Mr. Tangerone [the EPA inspector who visited the site and conferred with Overton] did not visit Spokane Transformer or is it your testimony that you do not recall that visit?
A: No. My testimony is that I don't recall that visit.
CP at 842 n. 9. This contradiction, however, does not create a genuine issue of material fact.
"When a party has given clear answers to unambiguous [deposition] questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."
Marshall v. AC & S, Inc., 56 Wash.App. 181, 185, 782 P.2d 1107 (1989) (quoting Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir.1984).) Since Overton initially stated he did not recall the EPA visit, he was incompetent for lack of personal knowledge to testify as to whether EPA notified him of the presence of PCB during that visit. See ER 602. Thus the only admissible evidence before the court on the issue of when Spokane Transformer was given notice was the authenticated EPA reports.
Moreover, Overton's conclusory statement the visits did not take place because he did not recall them is not properly considered on summary judgment in any event. CR 56(e) provides:
When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.
"The `facts' required by CR 56(e) to defeat a summary judgment motion are evidentiary in nature. Ultimate facts or conclusions of fact are insufficient. Likewise, conclusory statements of fact will not suffice." Grimwood v. Univ. of Puget Sound, 110 Wash.2d 355, 359, 753 P.2d 517 (1988) (citation omitted). Lack of recall is not sufficient to controvert clear opposing evidence on a summary judgment motion. See Marshall, 56 Wash.App. at 184, 782 P.2d 1107.
From this point on, the chips fall in the insurers' favor. There was no genuine issue of material fact as to when the EPA notified Spokane Transformer of the presence of PCB. For purposes of the insurers' summary judgment motions, Spokane Transformer knew of the PCB since at least 1976. The PCB contamination constitutes property damage as defined in the policy. Spokane Transformer's knowledge predated its purchase of the policies. Thus, regardless of when Spokane Transformer became liable to the Gisselbergs for contribution to the cleanup cost, the property damage was not unexpected from Spokane Transformer's standpoint. Therefore, there was no "occurrence" triggering coverage, and alternative grounds to deny coverage need not be considered.[2]

C
The Court of Appeals also erred when it imported a third party requirement into its "occurrence" analysis. Overton, 101 Wash.App. at 658, 6 P.3d 1178. But the CGL policies do not contain such a requirement for purposes of determining initial coverage. Neither the definition of "occurrence" nor the definition of "property damage" specifies *329 the damaged property must be that of a third party.
Determining whether coverage exists under a CGL policy is a two-step process. McDonald v. State Farm Fire & Cas. Co., 119 Wash.2d 724, 731, 837 P.2d 1000 (1992). The burden first falls on the insured to show its loss is within the scope of the policy's insured losses. Id. If such a showing has been made, the insurer can nevertheless avoid liability by showing the loss is excluded by specific policy language. Id. The question of ownership of damaged property applies only to policy exclusions. The determination of an "occurrence" takes place without consideration of whether the damage was to the insured's own property or to that of a third party.
Spokane Transformer claims the Court of Appeals' third party distinction is supported by Boeing Co., 113 Wash.2d 869, 784 P.2d 507 and Olds-Olympic, Inc. v. Commercial Union Insurance Co., 129 Wash.2d 464, 918 P.2d 923 (1996). To the contrary, Boeing merely demonstrates the "occurrence" determination is made without regard to property ownership. The Boeing court's finding of property damage was based on the definition "discharge of hazardous waste into the water." Boeing Co., 113 Wash.2d at 886, 784 P.2d 507. This definition makes no mention of property ownership; its focus is on the event causing physical injury to or destruction of property. As for Olds-Olympic, that case actually clarifies the coverage/exclusion distinction by explaining CGL policies require coverage when there is property damage caused by an occurrence, but "[t]he exclusionary language in the policies makes clear the property damage must be to the property interest of another rather than to the property owned by the insured itself." Olds-Olympic, 129 Wash.2d at 474, 918 P.2d 923 (emphasis added); see also Diamaco, Inc. v. Aetna Cas. & Sur. Co., 97 Wash.App. 335, 338, 983 P.2d 707 (1999) ("The policy language, fairly read, does not support [the insurer's] contention that the term `property damage' is limited to `property of another.'"), review denied, 140 Wash.2d 1013, 5 P.3d 8 (2000).[3]
For purposes of establishing coverage under the "occurrence" analysis, the proper inquiry is whether Spokane Transformer expected the physical injury to tangible property without regard to ownership of that property. As set forth above, because Spokane Transformer knew of the PCB contamination before purchasing the policies, coverage was properly denied on the ground there was no "occurrence." In addition, coverage was properly denied under the known-loss principle. The Court of Appeals' decision on the coverage issue is reversed, and the trial court's order granting summary judgment reinstated.

III
Spokane Transformer argues Consolidated and Industrial denied coverage for the Gisselbergs suit in bad faith and in violation of the Consumer Protection Act. The Court of Appeals found these claims to be unwarranted, affirming the trial court's dismissal on these points. Overton, 101 Wash.App. at 660-61, 6 P.3d 1178.
The tort of bad faith is based in the recognition that "the business of insurance affects the public interest and that an insurer has a duty to act in good faith." Kirk v. Mt. Airy Ins. Co., 134 Wash.2d 558, 560, 951 P.2d 1124 (1998) (citing RCW 48.01.030). Claims of bad faith are not easy to establish and an insured has a heavy burden to meet. Ellwein v. Hartford Accident & Indem. Co., 142 Wash.2d 766, 775, 15 P.3d 640 (2001). To succeed, the insured must show the insurer's breach of the insurance contract was "unreasonable, frivolous, or unfounded." Kirk, 134 Wash.2d at 560, 951 P.2d 1124. If the insurer's denial of coverage is based on a reasonable interpretation of the insurance policy, there is no action for bad faith. Id.
*330 Here, the insurers' denial of coverage was based on a reasonable interpretation of the CGL policies. These only cover property damage that is unexpected from the standpoint of the insurer. Since the insurers' investigation revealed Spokane Transformer knew of the PCB contamination before buying the policies, their interpretation and conclusion there was no coverage was reasonable. Viewing the record in the light most favorable to Spokane Transformer, there is nothing to indicate bad faith on the part of the insurers.
As for the Consumer Protection Act claim, Spokane Transformer must show the insurers engaged in an unfair or deceptive act or practice occurring in trade or commerce that impacted the public interest and caused them injury in their business or property. See RCW 19.86.020; Indus. Indem. Co. of the N.W., Inc. v. Kallevig, 114 Wash.2d 907, 920-21, 792 P.2d 520 (1990). A denial of coverage does not constitute an unfair or deceptive act or practice as long as it is based on reasonable conduct of the insurer. Villella v. Pub. Employees Mut. Ins. Co., 106 Wash.2d 806, 821, 725 P.2d 957 (1986). This is so even if the denial ultimately is proved incorrect. Id.
As the insurers point out, investigation of a third party liability claim differs greatly from a fact-intensive first party claim in which the insurer itself must determine the validity of the claim. In a third party liability claim, however, the universe of relevant facts is largely contained in the complaint against the insured. Any additional facts within the insured's knowledge can be easily submitted to the insurer. The record demonstrates both Consolidated and Industrial made adequate and timely investigation of Spokane Transformer's claim. Their denial of coverage was therefore supported by substantial justification. See id.
While reversing on the coverage issue, the Court of Appeals agreed with the trial court that no bad faith or Consumer Protection Act claims existed. Overton, 101 Wash.App. at 661, 6 P.3d 1178. The court held the coverage questions raised by the insurers were reasonable given the EPA's 1976 notice to Spokane Transformer. Id.
We agree the insurers reasonably believed Spokane Transformer was excluded due to the 1976 notice of the presence of PCB. The trial court and the Court of Appeals are accordingly affirmed on the bad faith and Consumer Protection Act issues.

CONCLUSION
Spokane Transformer knew of the PCB contamination prior to purchasing the CGL policies from Consolidated and Industrial. The property damage stemming from that contamination could therefore not constitute an "occurrence," which is required to trigger coverage. The trial court's order granting summary judgment of dismissal on these issues is reinstated and the Court of Appeals is reversed. The Court of Appeals decision on the bad faith and Consumer Protection Act issues is affirmed. Consolidated and Industrial shall recover their costs on appeal.
ALEXANDER, C.J., and SMITH, MADSEN, and OWENS, JJ., concur.
CHAMBERS, J., dissents by separate opinion.
JOHNSON, IRELAND and BRIDGE, JJ., dissent.
CHAMBERS, J. (dissenting).
I respectfully dissent. The "neither expected nor intended" requirement of an "occurrence," as used in the Consolidated Insurance Company (Consolidated) and Industrial Indemnity Insurance Company of the Northwest (Industrial Indemnity) policies, is satisfied unless the insured knew with "substantial probability" a known condition would cause harm. The trial court improperly granted summary judgment without a full evidentiary hearing to determine whether the insurers had established that there was no "occurrence." Further, even if the trial court's ultimate determination is proved correct, the duty to defend is broader than the duty to indemnify. The allegations in the complaint were sufficient to trigger this duty to defend, since there was potential coverage based on the facts alleged. The insurer could have defended under a reservation of *331 rights but chose not to do so. The insurer was in breach of its duty to defend from the time Jerry Overton, f/d/b/a Spokane Transformer Company, tendered defense of the lawsuit of Paul and Mary Ann Gisselberg until judgment, settlement, or a binding declaratory judgment that there is no duty to defend. Consolidated's five-year breach of its duty to defend may even support a cause of action for bad faith. Therefore, the trial court should be reversed and the Court of Appeals affirmed.

FACTS
The Gisselbergs own the property that is the subject of the underlying suit. When they discovered it was contaminated by polychlorinated biphenols (PCB), they properly notified the Washington State Department of Ecology (DOE) and initiated cleanup. The Gisselbergs then sought indemnification from Overton through legal action. Overton, a former operator of a facility on the property, is among those potentially jointly and severally responsible for the cleanup under Washington's Model Toxics Control Act (MTCA), chapter 70.105D RCW. In 1994, Overton submitted the complaint to past insurers, Consolidated and Industrial Indemnity. The complaint specifically alleged that: "One or more of the defendants, jointly or severally, caused the disposal, storage, or release of hazardous compounds, materials and chemicals including, without limitation, polychlorinated biphenols, commonly known as PCB, onto, into or over the real property at issue." Clerk's Papers (CP) at 69.
Both insurers declined to accept liability or defend against the claim. The insurers claimed that Overton knew about the PCB on his property when he bought the policies and therefore there was no insured "occurrence." In 1976, the DOE and the Federal Environmental Protection Agency (EPA) inspected the site and discovered PCB. According to EPA records, Overton denied the presence of PCB and refused to cooperate. Overton testified in a deposition he had no memory of the government inspections. He went on to declare:
At no time, while the corporation leased this property from Mr. Boyce, did I believe I would be responsible for any environmental cleanup pertaining to PCB. The company did not purchase, use, store or discharge PCBs. At no time did I have any discussions with Richard Boyce regarding PCBs or soil contamination with respect to this property during the time that the corporation leased the property....
At no time, while the corporation leased this property, did anyone tell me I had a legal duty or obligation to perform an environmental cleanup or direct me to do so regarding PCB contamination.
CP at 792-93. Overton purchased the insurance policies in 1977 and 1979, before the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675 was enacted in 1980, more than a decade before the voters of this State approved the law forming the basis for the underlying claim, MTCA, and almost 20 years before the Gisselbergs' claim at issue here. At summary judgment, Consolidated had the burden of establishing Overton knew with substantial probability that there was or would be an occurrence resulting in property damage when he purchased the insurance. Overton created a material issue of fact when he testified in his deposition that he did not know, expect, or intend any potential liability pertaining to the PCB.
After multiple summary judgment proceedings, the trial court concluded there was no coverage because Overton knew of the presence of PCB before purchasing insurance. For the reasons set forth below, the trial court should be reversed and the Court of Appeals affirmed.

ANALYSIS

Occurrence
Few words have generated so many appellate court opinions as "occurrence." A large and well-established body of law has developed to help insurers, insureds and the courts interpret the term "occurrence" within insurance policies. Because different kinds of insurance policies insure against different kinds of occurrences, the term is best analyzed within the context of the appropriate *332 policy, coverage, and risk in question. This Court has extensively analyzed the term "occurrence" within the context of potentially toxic contaminates, and developed a rich jurisprudence to analyze just this sort of question. See, e.g., Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wash.2d 654, 15 P.3d 115 (2000); Queen City Farms, Inc. v. Cent. Nat'l Ins. Co., 126 Wash.2d 50, 882 P.2d 703, 891 P.2d 718 (1994).
The policy in question is a liability policy, and the relevant policy language states:
The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
Coverage A. bodily injury or
Coverage B. property damage
to which this insurance applies, caused by an occurrence[.]
CP at 295.
The policy defines occurrence:
"occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured[.]
CP at 296 (emphasis added).
Overton asserts he has been sued and may "bec[o]me legally obligated to pay" damages because of "damage to property" as a result of an "occurrence" or "accident" which he "neither expected nor intended." This turns on whether he expected or intended the occurrence or accident that may ultimately result in liability, PCB contamination. This is analyzed under the "known risk defense," the principle that insurance is purchased against contingencies, not certainties. "The known risk defense is premised on the principle that an insured cannot collect on an insurance claim for a loss that the insured subjectively knew would occur at the time the insurance was purchased.... This is a question of fact." Pub. Util. Dist. No. 1 v. Int'l Ins. Co., 124 Wash.2d 789, 805, 881 P.2d 1020 (1994).
It is not sufficient for the insurer to show that the insured was aware of a potential risk. Consumers buy fire and flood insurance precisely because they are concerned about potential fires and floods. Therefore, it is not sufficient for Consolidated and Industrial Indemnity to show that Overton was or should have been aware of a potential risk. An insurer must show that the insured knew with "substantial probability" that the harm giving rise to potential liability insured against would occur. To determine this, we need to peer into Overton's subjective knowledge at the time he purchased the insurance, 1977 and 1979.
The trial judge determined on summary judgment that Overton was informed by the DOE and the EPA that there was PCB on the property. The trial judge concluded Overton's declaration that he did not know of the PCB nor anticipate liability for environmental cleanup was not sufficient to rebut the insurers' evidence. This was error.
In Queen City Farms, we considered an allied issue. Queen City Farms, 126 Wash.2d 50, 882 P.2d 703. Although the specific exclusions raised in Queen City Farms were a "pollution exclusion" in one policy and the "occurrence exclusion" in another, they were treated functionally the same. Compare 126 Wash.2d at 73, 882 P.2d 703 with 126 Wash.2d at 94, 882 P.2d 703. Each required an event that was unexpected and unintended. Queen City Farms concerned property used as a hazardous waste disposal site for many years. That the insureds knew of contaminates on the property was beyond questionthe insured knew the property was a landfill accepting hazardous materials. However, this Court found that fact not determinative. Instead, we rested our holding on the fact the owners "never expected wastes from the ponds to contaminate the surrounding ground and groundwater." Queen City Farms, 126 Wash.2d at 59, 882 P.2d 703. Put another way, the question is not whether an insured knew of the existence of a condition, or should have appreciated the significance, but instead whether the insured knew and appreciated the significance. See Queen City Farms, 126 Wash.2d at 66, 882 P.2d 703 ("[A]n objective standard is inconsistent with insurance coverage for damage resulting from ordinary negligence."). While today it would strain credulity to believe a business owner would not *333 expect PCB in the soil to cause future liability, it is perfectly consistent with Overton's statements, and our case law, that Overton did not have such subjective knowledge at the time he purchased the insurance. Accord Queen City Farms, 126 Wash.2d at 79, 882 P.2d 703 (citing New Castle County v. Hartford Accident & Indem. Co., 933 F.2d 1162, 1167 (3d Cir.1991) (noting that in the late 1960s little was known about environmental danger posed by sanitary landfills; few recognized the extent to which landfills threatened pollution of groundwater)).
Further, the majority's reliance on City of Okanogan v. Cities Ins. Ass'n, 72 Wash.App. 697, 865 P.2d 576 (1994) is misplaced. Okanogan merely held that when the insured had actual knowledge of a risk that was causing harm, there was no "occurrence" as defined by the policy. Okanogan, 72 Wash. App. at 701-02, 865 P.2d 576. There is no such finding here; at most, reasonable minds could conclude Overton knew at some point PCBs were present; not that Overton knew PCB would cause a loss or potential liability.[1] Similarly, Time Oil held the insured could not claim that their loss was unforeseen or unexpected when they knew with "substantial probability" that they would be required to pay damages for contamination. See Time Oil Co. v. Cigna Prop. & Cas. Ins. Co., 743 F.Supp. 1400, 1414 (1990) (collecting cases). It is a question of fact whether the insured knew PCB would cause damage to the property and require remediation. Whether Overton knew with "substantial probability" could not be determined at summary judgment based on the record before us.
At summary judgment or a hearing on a declaratory judgment motion, the insurer bears the burden to show that the insured knew with "substantial probability" the harm would occur. See Queen City Farms, 126 Wash.2d at 72, 882 P.2d 703 (the insurer had the burden to show the injury or damage was expected or intended); Time Oil Co., 743 F.Supp. at 1413-14 (holding that when insured knew with substantial certainty loss would occur, not an "occurrence" under a general liability policy). The evidence submitted by Consolidated tended to show the DOE and EPA had inspected the property in the mid 1970s and informed Overton that there may have been PCB on the property. I agree with the trial court that Overton's statement he did not remember these inspections was insufficient to controvert the evidence that the EPA and DOE inspected the property and informed him there were PCBs on the property. However, that is not the question the trial court should have answered; instead, the question is whether, when he purchased the insurance, Overton knew with substantial probability that a harm causing liability from the PCB would occur. There is no evidence Overton appreciated, subjectively, the import of the visit or that Overton could have anticipated changes in the law that would greatly increase his potential liability. Functionally, the trial court weighed the evidence submitted, which was improper.

Duty to Defend
Even though the majority concludes that there was no coverage under the policy, that should not end the inquiry. An insurer's duty to defend is broader than its duty to indemnify. Hayden v. Mut. of Enumclaw Ins. Co., 141 Wash.2d 55, 64, 1 P.3d 1167 (2000).
The duty to defend "does not hinge on the insured's potential liability to the claimant, but on whether the complaint alleges any facts rendering the insurer liable to the insured under the policy language." Aetna Cas. & Sur. Co. v. M & S Indus., 64 Wash. App. 916, 927-28, 827 P.2d 321 (1992). The complaint should be construed liberally in favor of recognizing the duty to defend. Id. at 928, 827 P.2d 321. Here, the complaint alleged that PCBs were deposited in the soil during the period covered by the policy and that Spokane Transformer was strictly liable. These allegations, if proved, would be sufficient *334 to trigger the duty to indemnify. Thus, they trigger the duty to defend.
If the complaint alleges liability that falls unequivocally within an exclusion, the duty to defend is excused. Baugh Constr. Co. v. Mission Ins. Co., 836 F.2d 1164, 1168 (9th Cir.1988) (applying Washington law). The insurer conceded that coverage issues are not unambiguous but are fairly debatable:
Here, this court knows from its own experience addressing Consolidated's Renewed Motion for Summary Judgment and the plaintiffs' Motion for Reconsideration that the coverage issues involved are fairly debatable.
CP at 1009.
One exception to the rule that the duty to insure must be determined only from the complaint occurs when the complaint is ambiguous. If the duty to defend is not clear from the face of the complaint but cannot be ruled out, the insurer must investigate the claim in order to give the insured the benefit of the doubt in determining whether the insurer has an obligation. See Ins. Co. of N. Am. v. Ins. Co. of Pa., 17 Wash.App. 331, 334, 562 P.2d 1004 (1977). However, this rule assists only the insured, not the insurer, and there is no ambiguity in the complaint at issue.
The triggering event for the duty to defend is the filing of the complaint. Griffin v. Allstate Ins. Co., 108 Wash.App. 133, 138, 29 P.3d 777 (2001), modified on denial of recon., 36 P.3d 552 (Wash.Ct.App.2001). The duty arises when "a complaint against the insured, construed liberally, alleges facts which could, if proven, impose liability upon the insured within the policy's coverage." Unigard Ins. Co. v. Leven, 97 Wash.App. 417, 425, 983 P.2d 1155 (1999). Even when the contract requires the insured to tender as a condition precedent to the duty to defend, a breach of the insured's duty to tender does not relieve the insurer of its duty absent prejudice. See Or. Auto. Ins. Co. v. Salzberg, 85 Wash.2d 372, 376-77, 535 P.2d 816 (1975). Once a tender is made, the duty is unequivocal. See, e.g., Unigard Ins. Co., 97 Wash.App. at 427, 983 P.2d 1155. Thus, the duty began at the latest when Overton tendered defense of the Gisselbergs' suit to Industrial Indemnity and Consolidated.
An insurer's duty to defend is a continuing one, and does not end until the underlying action is resolved or it is shown that there is no potential for coverage. 14 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 200:29 (3d ed. 1999). Washington courts have held that the duty continues until a judgment or settlement has been reached with the injured party or the permission of the insured has been obtained to forgo the duty. Viking Ins. Co. v. Hill, 57 Wash.App. 341, 348, 787 P.2d 1385 (1990). Other jurisdictions are in accord. See, e.g., Samply v. Integrity Ins. Co., 476 So.2d 79 (Ala.1985); Conway v. Country Cas. Ins. Co., 92 Ill.2d 388, 65 Ill.Dec. 934, 442 N.E.2d 245 (1982); Delaney v. Vardine Paratransit, Inc., 132 Misc.2d 397, 504 N.Y.S.2d 70 (1986).
Insurers argue that because they knew that Overton was aware of the PCB contamination well before buying insurance, a reasonable interpretation of the policy led to the conclusion that the property damage was either expected or intended by the insured. However, the complaint described a covered event and Overton denied he either expected or intended harm. Therefore, the insurer had a duty to defend until it obtained a judicial determination that it had no duty to defend. Here, there was a five-year delay between the time that the insurer received the tender of defense and it obtained its order on summary judgment. It breached its duty to defend.
The insurer could have avoided the problem by defending under a reservation of rights or seeking a declaratory judgment that it had no duty to defend, or both. See Grange Ins. Co. v. Brosseau, 113 Wash.2d 91, 93-95, 776 P.2d 123 (1989). Instead, it did nothing. A reservation of rights is a means by which the insurer avoids breaching its duty to defend while avoiding waiver and estoppel. "When that course of action is taken, the insured receives the defense promised and, if coverage is found not to exist, the insurer will not be obligated to pay." Kirk v. Mt. Airy Ins. Co., 134 Wash.2d 558, 563 n. 3, 951 P.2d 1124 (1998).
*335 If an insurer unreasonably refuses its duty to defend, it has acted in bad faith. Transcon. Ins. Co. v. Wash. Pub. Utils. Dists'. Util. Sys., 111 Wash.2d 452, 470, 760 P.2d 337 (1988). Bad faith can be found even where, as the majority finds here, an insurer is later found to have correctly denied indemnification coverage. Coventry Assocs. v. Am. States Ins. Co., 136 Wash.2d 269, 279, 961 P.2d 933 (1998). However, if the insurer denies coverage based on a reasonable interpretation of the policy, it does not act in bad faith. Kirk, 134 Wash.2d at 560, 951 P.2d 1124. Insurers argue that because they knew that Overton was aware of the PCB contamination well before buying coverage, a reasonable interpretation of the policy led to the conclusion that the exclusion for existing known damage applied. If, as the insurer seems to have conceded, the coverage issues were "fairly debatable," this argument fails.
An insurer who breaches the duty to defend must put its insured in as good a position as he or she would have been in had the contract not been breached. Greer v. N.W. Nat'l Ins. Co., 109 Wash.2d 191, 202-03, 743 P.2d 1244 (1987). Recoverable damages include: (1) the amount of expenses, including reasonable attorney fees, the insured incurred in defending the underlying action, and (2) the amount of the judgment entered against the insured. Greer, 109 Wash.2d at 202, 743 P.2d 1244. The duty to defend, which was triggered by the tender of defense in 1994, does not terminate until there is a conclusive determination that there was no "occurrence" under the policy. The costs of the defense from 1994 until that point must be borne by the insurer.
Consolidated breached its duty to defend a potentially covered occurrence. Therefore, I respectfully dissent and would remand to the trial court for further proceedings consistent with this opinion.
JOHNSON, IRELAND, and BRIDGE, JJ., concur.
NOTES
[1] The court did not rule with regard to the owned-property exclusion. See Clerk's Papers (CP) at 1181.
[2] We also find Spokane Transformer's argument the pollution exclusion does not apply because the PCB discharge was not onto the property of a third party to be without merit. See Queen City Farms, 126 Wash.2d at 90, 882 P.2d 703 (imposing no requirement the discharge affect a third party for the pollution exclusion to apply).
[3] The exclusions section of the policies contain a standard owned-property exclusion, which says the policy will not cover property damage to property owned, occupied by, or rented to the insured. However, the applicability of this provision is not challenged on appeal by either party. Even if it were, the owned-property exclusion would not factor into the initial "occurrence" determination. Olds-Olympic, 129 Wash.2d at 473-74, 918 P.2d 923.
[1] I note that the insurance policies were purchased in 1977, 3 years before Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675, was enacted, and 11 years before the voters of this State approved the law forming the basis for the underlying claim, MTCA. We must not forget that the legal landscape was significantly different in 1977.