# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ZURICH AMERICAN INSURANCE COMPANY, a foreign insurance company, | No. 76490-0-I |
| Respondent/Cross-Appellant, | |
| v. | DIVISION ONE |
| LEDCOR INDUSTRIES (USA) INC., a Washington corporation, ADMIRAL WAY, LLC, a Washington limited liability company, and SQI, INC., a Washington corporation, | UNPUBLISHED OPINION |
| | FILED: December 10, 2018 |
| Appellants/Cross-Respondents. | |
| LEDCOR INDUSTRIES (USA) INC., a Washington corporation, | |
| Appellants, | |
| v. | |
| AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, INC., a foreign insurance company; CAMBRIDGE INTEGRATED SERVICES GROUP, INC., a foreign corporation; LIBERTY INSURANCE UNDERWRITERS, INC., a foreign insurance company; AIU | |

COMMERCIAL INSURANCE
COMPANY OF CANADA, a foreign
insurance company; LEXINGTON
INSURANCE COMPANY, a foreign
insurance company; LIBERTY
SURPLUS INSURANCE
CORPORATION, a foreign insurance
company; HARTFORD PROPERTY
AND CASUALTY COMPANY, a foreign
insurance company; and
CONTINENTAL WESTERN
INSURANCE COMPANY, a foreign
insurance company,

          Third-Party Defendants,

VIRGINIA SURETY COMPANY, INC., a
foreign insurance company;
TRANSPORTATION INSURANCE
COMPANY, a foreign insurance
company; TRANSCONTINENTAL
INSURANCE COMPANY, a foreign
insurance company; NORTH PACIFIC
INSURANCE COMPANY, a foreign
insurance company; and FIRST
MERCURY INSURANCE COMPANY, a
foreign insurance company,

          Respondents.

MANN, A.C.J. — This is one of two closely connected insurance coverage appeals arising out of the construction of "The Admiral," a mixed use condominium building in West Seattle.[1] The appellant in this case was the general contractor, Ledcor Industries (USA), Inc. (Ledcor). The building owner and developer, Admiral Way LLC (Admiral Way), contracted with Ledcor for construction of the building. Ledcor in turn contracted with several subcontractors, including The Painters, Inc. (The Painters) and SQI, Inc. (SQI).

---

[1] See Admiral Way, LLC v. Zurich American Ins. Co., No. 76405-5-I (Wash. Ct. App. Dec. 10, 2018) (unpublished).

After the Admiral Way Condominium Owners' Association (COA) sued Admiral Way and Ledcor in 2007 for construction defects, Ledcor tendered the claim to its insurers and its subcontractors' insurers. After responding and defending against the COA's claims under a reservation of rights, Zurich American Insurance Company (Zurich) filed a declaratory judgment action against Ledcor claiming it did not owe coverage under its policies. Ledcor responded by filing counterclaims and third-party causes against multiple insurers claiming bad faith and violations of the Consumer Protection Act (CPA)[2], and the Insurance Fair Conduct Act (IFCA)[3].

Ledcor appeals the trial court's decision granting summary judgment and dismissing Zurich, Virginia Surety Company (VSC), First Mercury Insurance Company (FMIC), North Pacific Insurance Company (North Pacific), and Transportation Insurance Company (Transportation). We reverse dismissal of Ledcor's claims against VSC and Transportation. We affirm dismissal of Zurich, FMIC, and North Pacific.

## FACTS

Admiral Way is the owner and developer of "The Admiral" a mixed use, four-story building in West Seattle with street level retail, 60 condominiums and an underground parking garage. On April 3, 2001, Admiral Way and Ledcor entered into a construction contract for construction of the building. Ledcor was the general contractor. Ledcor in turn contracted with various specialty subcontractors. Relevant to this appeal, Ledcor subcontracted with SQI to install the original roof, and in 2005, Ledcor again subcontracted with SQI to conduct substantial roofing repair. Ledcor subcontracted with

---

[2] Ch. 19.86 RCW
[3] RCW 48.30.010-.015

The Painters to provide labor, materials, and equipment for a "Gacoflex" waterproofing system on the balconies and courtyards of The Admiral.

The contract between Ledcor and Admiral Way required Ledcor to obtain commercial general liability (CGL) insurance naming Admiral Way as an additional insured. The contract between Ledcor and its subcontractors required that the subcontractors each obtain CGL insurance naming Ledcor as an additional insured.

Ledcor purchased a CGL insurance policy from VSC for the policy period of December 1, 2003 through December 1, 2004. Ledcor also purchased two consecutive annual CGL policies from Zurich, for the policy periods from December 1, 2005 through December 1, 2007. SQI purchased three consecutive annual CGL policies from Transportation covering the period from May 1, 2000 through May 1, 2003. SQI also purchased CGL policies from FMIC for the policy period of May 1, 2006 to May 1, 2008. The Painters purchased CGL policies from North Pacific for the period of December 26, 2001 to December 26, 2002.

Construction of The Admiral began in 2001. The City of Seattle issued a certificate of occupancy in March 2003. The sale of condominiums began in April 2013. After a contract dispute, on February 10, 2004, Ledcor and Admiral Way executed a contract addendum that resolved their remaining disputes about payment and performance of Ledcor's work. The parties agreed in the addendum that the project was complete other than specific items in an attached punch list that were to be completed by February 20, 2004.

In 2001, Admiral Way retained Morrison Hershfield (Morrison) as a building envelope consultant to provide recommendations to the project architect on balcony and

wall interface details. Ledcor also retained Morrison and received a report from the firm in December 2002. Morrison concluded there were significant areas where there was "inappropriate design, and to a lesser degree inappropriate construction that in our opinion makes the building high risk for premature building envelope failure." In March 2003, Morrison recommended substantial repairs to the building's brick veneer and pre-cast column caps. Morrison believed that if the recommended work was not done, the walls would "remain susceptible to water entry" that "would lead to deterioration of the sheathing and corrosion of the framing," and "result in a compromise of the structural integrity." Morrison further reported, "[w]e are of the opinion that if not address[ed] at this time, these as-built details will require remediation within the next five years." Morrison expressed similar concerns with other recommended work.

On February 28, 2007, the COA sent Admiral Way a notice of construction defect claim alleging that the building, or components of the building, were defectively designed and/or constructed, resulting in water intrusion that affected residential units, commercial spaces, and common areas throughout the project. This notice was followed by the filing of a complaint in the King County Superior Court. In its complaint, the COA alleged that damage to the building began after the completion of construction:

> As a result of Declarant's acts and omissions, property damage to the Condominium has occurred to that part of real property on which contractors or subcontractors working on Declarant's behalf have completed their operations. Such property damage has also occurred to that part of real property that must be restored, repaired or replaced because of the work of others performed on Declarant's behalf. The property damage is continuous and ongoing throughout the Condominium. Damage may have commenced at or shortly after the completion of each building or element of infrastructure, and may be continuing to the present.

In response to the COA complaint Admiral Way filed a third-party complaint against Ledcor alleging Ledcor and its subcontractors were responsible for the defective work.

Ledcor initially tendered defense of the action to its own insurers Zurich and VSC. Zurich accepted Ledcor's tender and assigned counsel. Zurich defended Ledcor in the underlying case, from 2007 through settlement in July 2009, while expressly reserving its right to contest coverage under a reservation of rights.

Ledcor also tendered the action to FMIC, Transportation, and North Pacific, for defense and indemnity for damages arising from SQI's and The Painters' work. FMIC accepted SQI's tender under a reservation of rights and contributed to SQI's defense. FMIC did not defend nor indemnify Ledcor. Transportation and North Pacific denied coverage. VSC originally denied coverage, then agreed to defend Ledcor under a reservation of rights just as the final settlement was being reached. VSC did not pay any defense costs and did not indemnify.

Zurich filed the underlying action in March 2009 seeking declaratory judgment of its obligations to defend and indemnify its named insured, Ledcor, and the additional insured Admiral Way. Ledcor filed counterclaims for declaratory relief, insurance bad faith, and violations of the CPA and the IFCA. Ledcor's counterclaims included third parties FMIC, Transportation, North Pacific, and VSC, as well as multiple other insurers.

Meanwhile, the COA, Admiral Way, and Ledcor settled their dispute over the condominium damage on July 28, 2009. The COA's claims against Admiral Way and Ledcor settled for $4,700,000. The settlement was contingent upon AIG, another of

Ledcor's insurers funding $2,550,000. Ledcor agreed to pay $150,000, and Marc Gartin on behalf of Admiral Way agreed to pay $2,000,000.

The underlying declaratory judgment action proceeded with discovery and motions. In June 2010, the trial court granted Zurich's motions for partial summary judgment on (1) coverage under the policy in effect between December 1, 2006 and December 1, 2007 and (2) dismissing Ledcor's counterclaims for insurance bad faith, CPA, and IFCA violations. The trial court also denied Ledcor's motion for partial summary judgment against Zurich for insurance bad faith and CPA violations. At the same time, the trial court granted VSC's motion for summary judgment and dismissed Ledcor's claims against VSC.

In March 2011, the trial court dismissed Ledcor's remaining counterclaims against Zurich, concluding that Zurich had no duty to defend or indemnify Ledcor with respect to the COA's construction defect claims.

In April 2011, the trial court granted FMIC's motion for summary judgment concluding Ledcor was not entitled to coverage under the policy issued by FMIC to SQI as a matter of law.

In July 2011, the trial court granted North Pacific's motion for summary judgment and dismissed Ledcor's third party claims related to its policy issued to The Painters.

In February 2014, the trial court granted Transportation's motion for partial summary judgment and dismissed Ledcor's breach of contract claims for policies issued to SQI.

In a separate action, Ledcor sued its subcontractors. Through a settlement between Ledcor and SQI, Ledcor took assignment of SQI's direct claims against FMIC.

On October 31, 2016, the trial court granted FMIC's motion for summary judgment agreeing that FMIC did not have an obligation to cover SQI's defense against Ledcor's claim and that the policy FMIC issued to SQI was not applicable, and even if it were, the continuous or progressive injury or damage exclusion barred recovery.

Ledcor appeals.

## ANALYSIS

We review summary judgment orders de novo, engaging in the same inquiry as the trial court. Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). Summary judgment is proper if, after viewing all facts and reasonable inferences in the light most favorable to the nonmoving party, there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Elcon Const. Inc. v. E. Wash. Univ., 174 Wn.2d 157, 164, 273 P.3d 965 (2012). "The moving party on summary judgment must produce factual evidence showing that it is entitled to judgment as a matter of law. The burden then shifts to the nonmoving party to set forth facts showing that there is a genuine issue of material fact in dispute." Hartford Ins. Co. v. Ohio Cas. Ins. Co., 145 Wn. App. 765, 779, 189 P.3d 195 (2008).

A party opposing a motion for summary judgment may not rely on speculation, argumentative assertions that unresolved factual issues remain, or its affidavits considered at face value. Rather, "the nonmoving party must set forth specific facts that sufficiently rebut the moving party's contentions and reveal that a genuine issue as to a material fact exists." Herman v. Safeco Ins. Co. of Am., 104 Wn. App. 783, 787-88, 17 P.3d 631 (2001). "'Ultimate facts, conclusions of fact, conclusory statements of fact or legal conclusions are insufficient to raise a question of fact.'" Ainsworth v. Progressive

Cas. Ins. Co., 180 Wn. App. 52, 61, 322 P.3d 6 (2014) (quoting Snohomish County v. Rugg, 115 Wn. App. 218, 224, 61 P.3d 1184 (2002)). "On summary judgment review, we may affirm the trial court's decision on any basis within the record." Davidson Serles & Assocs. v. City of Kirkland, 159 Wn. App. 616, 624, 246 P.3d 822 (2011).

The outcome of this case depends on a proper interpretation of the various insurance policies issued to Ledcor and its subcontractors. Interpretation of insurance policies is a question of law we review de novo. Overton v. Consol. Ins. Co., 145 Wn.2d 417, 424, 38 P.3d 322 (2002). We construe insurance policies as contracts. Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wn.2d 654, 665, 15 P.3d 115 (2000). "Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to and made a part of the policy." RCW 48.18.520. We consider the policy as a whole, giving it a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." Am. Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co., 134 Wn.2d 413, 427-28, 951 P.2d 250 (1998). Where possible, we harmonize clauses that seem to conflict in order to give effect to all of the contract's provisions. Realm, Inc. v. City of Olympia, 168 Wn. App. 1, 5, 277 P.3d 679 (2012).

"If the policy language is clear and unambiguous, we must enforce it as written; we may not modify it or create ambiguity where none exists." Quadrant Corp. v. Am. States Ins. Co., 154 Wn.2d 165, 171, 110 P.3d 733 (2005). If a term is defined in a policy, "the term should be interpreted in accordance with that policy definition." Kitsap County v. Allstate Ins. Co., 136 Wn.2d 567, 576, 964 P.2d 1173 (1998). A clause is

ambiguous only "when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable." Quadrant, 154 Wn.2d at 171. If a clause is ambiguous, we may rely on extrinsic evidence of the intent of the parties to resolve the ambiguity. Weyerhaeuser, 142 Wn.2d at 666 (citing B & L Trucking, 134 Wn.2d at 427-28). Any ambiguity remaining after examination of the applicable extrinsic evidence is resolved against the insurer and in favor of the insured. Weyerhaeuser, 142 Wn.2d at 666. However, while exclusions should be strictly construed against the drafter, a strict application should not trump the plain, clear language of an exclusion such that a strained or forced construction results. Weyerhaeuser Co., 142 Wn.2d at 666.

*Zurich*

Ledcor contends that the trial court erred in concluding that Zurich did not have a duty to defend under the CGL policies and in dismissing Ledcor's claims for insurance bad faith, and for violations of the CPA and the IFCA. We disagree.

A.    Duty to Defend

The duty to defend is different from and broader than the duty to indemnify. Am. Best Food, Inc. v. Alea London, 168 Wn.2d 398, 404, 229 P.3d 693 (2010); Expedia, Inc. v. Steadfast Ins. Co., 180 Wn.2d 793, 802, 329 P.3d 59 (2014). The duty to defend is one of the main benefits of an insurance contract. Safeco Ins. Co. of Am. v. Butler, 118 Wn.2d 383, 392, 823 P.2d 499 (1992). "While the duty to indemnify exists only if the policy covers the insured's liability, the duty to defend is triggered if the insurance policy conceivably covers allegations in the complaint." Expedia, 180 Wn.2d at 802. "'The duty to defend arises when a complaint against the insured, construed liberally, alleges facts that could, if proven, impose liability upon the insured within the policy's

coverage.'" Expedia, 180 Wn.2d at 803 (quoting Am Best Food, 168 Wn.2d at 404-05). Exclusionary clauses in the policy are "strictly construed against the insurer." Expedia, 180 Wn.2d at 803. "If the complaint is ambiguous, it will be liberally construed in favor of triggering the insurer's duty to defend." Truck Ins. Exch. v. Vanport Homes, 147 Wn.2d 751, 760, 5 P.3d 276 (2002).

The duty to defend is generally determined by looking at the "eight corners" of the insurance contract and the underlying complaint. The insurer is permitted to utilize the "'eight corners'" rule to determine whether, on the face of the complaint and the insurance policy, there is an issue of fact or law that could conceivably result in coverage under the policy. Expedia, 180 Wn.2d at 803. "There are two exceptions to this rule, and both favor the insured." Expedia, 180 Wn.2d at 803. First, "if it is not clear from the face of the complaint that the policy provides coverage, but coverage could exist, the insurer must investigate and give the insured the benefit of the doubt that the insurer has a duty to defend." Woo v. Fireman's Fund Ins. Co., 161 Wn.2d 43, 53, 164 P.3d 454 (2007). Second, "if the allegations in the complaint conflict with facts known to the insurer or if the allegations are ambiguous, facts outside the complaint may be considered." Expedia, 180 Wn.2d at 803-04 (citing Woo, 161 Wn.2d at 54).

Ledcor was directly insured by Zurich under two general liability insurance policies. The first was effective from December 1, 2005 to December 1, 2006. The second was effective from December 1, 2006 to November 30, 2007. Each Zurich policy contained two endorsements that Zurich argues barred coverage for the COA's claims: a residential building exclusion and an exclusion for continuing damage that began before the policy was issued. The burden is on the insurer to show that the loss

No. 76490-0-I/12

is excluded under the policy. <u>Diamaco, Inc. v. Aetna Cas. & Sur. Co.</u>, 97 Wn. App. 335, 337, 983 P.2d 707 (1999).

The policies issued by Zurich to Ledcor contain an exclusion for designated work on residential buildings. The first policy (December 1, 2005 through December 1, 2006) excluded coverage for property damage caused by "your work" and defined "your work" as:

> This exclusion only applies to "your work" in connection with the construction, reconstruction, remodeling, or repair of any "<u>residential building</u>". For the purpose of this endorsement, "residential building" means: 1. Any single-family dwelling, including town homes or townhouses, other than military base housing, and 2. Any multi-family dwelling, including <u>condominiums</u> or cooperatives, duplexes, triplexes or four-plexes; and 3. Any apartments, assisted living facilities or resort timeshares, if made of wood frame, or partially made of wood frame construction; and 4. <u>Any other structure which is attached to any such "residential building."</u> The determination as to the type of structure will be made at the time a claim is made or suit is brought.[4]

The endorsement in Zurich's second policy (December 1, 2006 through December 1, 2007) defined "your work" as follows:

> This exclusion only applies to "your work" in connection with the construction, reconstruction, remodeling, or repair of any "residential building". For the purpose of this endorsement, "<u>residential building</u>" means: . . .
> 1. Any single-family dwelling, including but not limited to houses, town homes or townhouses, or
> 2. Any multi-family dwelling, including but not limited to <u>condominiums</u>, cooperatives, duplexes, triplexes or fourplexes; or
> 3. Any structure that combines any other use with residential dwellings including but not limited to, those listed in 1. or 2. above, or
> 4. <u>Any other structure or improvement which is attached to or ancillary to any structure identified in 1., 2., or 3.</u> Above, constructed, reconstructed, remodeled, or repaired with the intent that title to each individual dwelling or dwelling unit will be transferred separately to each owner.

---

4 (Emphasis added.)

Notwithstanding the above, "residential building" does not include any structure that functions as apartments, time shares, a hotel, a motel, a nursing home, an assisted living senior housing care facility, a college campus dormitory, or government housing on military bases.[5]

Ledcor argues that The Admiral was not a residential building, but was instead a "mixed use" building that included street level retail and thus did not fall under the designated work exclusion. However, the plain language of the residential building exclusion includes "condominiums" and "[a]ny other structure which is attached to any such 'residential building.'" The Zurich policy language was broad enough to include residential buildings that incorporate other "structures." The Admiral, even with the attached commercial units at the base, qualifies as a residential building.

Ledcor also argues that because The Admiral includes apartment units, the residential building exclusion does not apply. While The Admiral does allow 25 percent of the owners to rent their units out as "apartments," the units are still within the legal definition of a condominium. The "intent that title to each individual dwelling or dwelling unit will be transferred separately to each owner" is still in place, even if some condominiums are later sublet out as apartments. Ledcor's argument fails. Because The Admiral is a defined residential building under both policies, Zurich did not have a duty to defend or indemnify.

B.     Bad Faith

An insurer acts in bad faith if its breach of the duty to defend was unreasonable, frivolous, or unfounded. See St. Paul Fire & Marine Ins. Co. v. Onvia, Inc., 165 Wn.2d 122, 130, 196 P.3d 664 (2008). Whether an insurer acted in bad faith is generally a question of fact. Van Noy v. State Farm Mut. Auto. Ins. Co., 142 Wn.2d 784, 796, 16

---

[5] (Emphasis added.)

P.3d 574 (2001). Accordingly, an insurer is only entitled to dismissal on summary judgment of a policyholder's bad faith claim if there are no disputed material facts pertaining to the reasonableness of the insurer's conduct under the circumstances, or the insurance company is entitled to prevail as a matter of law on the facts construed most favorably to the nonmoving party. Smith v. Safeco Ins. Co., 150 Wn.2d 478, 484, 78 P.3d 1274 (2003).

"An action for bad faith handling of an insurance claim sounds in tort." Mut. of Enumclaw Ins. Co. v. Dan Paulson Constr., Inc., 161 Wn.2d 903, 915, 169 P.3d 1, (2007). Claims of insurer bad faith "are analyzed applying the same principles as any other tort: duty, breach of that duty, and damages proximately caused by any breach of duty." Smith, 150 Wn.2d at 485. "In order to establish bad faith, an insured is required to show the breach was unreasonable, frivolous, or unfounded." Kirk v. Mt. Airy Ins. Co., 134 Wn.2d 558, 560-61, 951 P.2d 1124 (1998).

Ledcor first contends Zurich committed bad faith by denying coverage and defending under a reservation of rights. Washington law has long favored defending under a reservation of rights "when the facts or the law affecting coverage is disputed," until coverage is settled in a declaratory action. Am. Best Food, 168 Wn.2d at 405. When defending under a reservation of rights, "the insured receives the defense promised and, if coverage is found not to exist, the insurer will not be obligated to pay." Mut. of Enumclaw, 161 Wn.2d at 914. However, an insurer defending its insured under a reservation of rights has "an enhanced obligation of fairness toward its insured." Tank v. State Farm Fire & Cas. Co., 105 Wn.2d 381, 388, 715 P.2d 1133 (1986). This enhanced obligation requires that the insurer must: (1) "thoroughly investigate" the claim

against the insured, (2) "retain competent defense counsel for the insured," (3) fully inform the insured of "all developments relevant to his policy coverage and the progress of his lawsuit," and (4) "refrain from engaging in any action which would demonstrate a greater concern for the insurer's monetary interest than for the insured's financial risk." Tank, 105 Wn.2d at 388.

After Ledcor tendered the claim to Zurich, Zurich agreed to defend Ledcor in the underlying case under a reservation of rights. Zurich defended Ledcor from 2007 through the settlement in July of 2009. Zurich provided the attorney of Ledcor's own choosing for their defense. There is no evidence that Ledcor was unsatisfied with its defense during this period. The record further demonstrates that Zurich fully investigated the incident, retained separate counsel to represent both Ledcor and Admiral Way, and fully informed and participated in settlement activity.[6] The only criteria in dispute in this case is whether Zurich engaged "in any action which would demonstrate a greater concern for the insurer's monetary interest than for the insured's financial risk" during the course of its defense of Ledcor, and in making its later coverage decision. On this record, we hold they did not.

Ledcor argues next that Zurich acted in bad faith by filing its declaratory judgment action before the underlying case brought by the COA was fully resolved. Our Supreme Court has said, "'[t]he insurer 'may defend under a reservation of rights while seeking a declaratory judgment that it has no duty to defend,' . . . but it must avoid seeking adjudication of factual matters disputed in the underlying litigation because advocating a position adverse to its insured's interests would 'constitute bad faith on its

---

[6] Ledcor at one point argues that Zurich did not do an adequate investigation, however that was related to coverage and not related to its defense of Ledcor. Moreover, Ledcor's arguments only demonstrate it disagrees with Zurich's interpretation of its "residential" clause.

part.'" Mut. of Enumclaw, 161 Wn.2d at 914-15 (quoting 1 ALLAN D. WINDT, INSURANCE CLAIMS & DISPUTES: REPRESENTATION OF INSURANCE COMPANIES AND INSUREDS § 8:3, at 8-11 to -12 (5th ed. 2007)). The court did not go so far as to bar filing a motion for summary judgment during the course of representation.

In this case, Zurich did not file its summary judgment motion until discovery in the underlying litigation with the COA was complete and the parties had mediated. The summary judgment motion was not argued nor decided until long after the final settlement had been entered. There is no evidence that Zurich's action filing its motion for summary judgment interfered with, or sought to adjudicate a factual matter in dispute in the underlying action to the detriment of Ledcor. Ledcor remained independently represented by counsel of its choice, funded by Zurich, and Ledcor does not contend its defense counsel was ineffective.

Ledcor also argues that Zurich committed bad faith in reaching its coverage decision. Specifically, Ledcor contends that Zurich's insurance adjuster transferred information obtained in the underlying claim to coverage counsel, and utilized it to Ledcor's detriment. Ledcor has failed, however, to identify any case law that prohibits using the same adjuster for both claims. Ledcor has also failed to demonstrate any confidential or privileged evidence that was provided to Zurich. Zurich provided a detailed list showing that it was entitled to all of the evidence it received, most of which was obtainable through the public record. Even on appeal, Ledcor does not identify any confidential documents that were relied on by Zurich in reaching its coverage decision, citing the "Morrison Report" and depositions, which were all publically available and discoverable by Zurich.

Finally, Ledcor raises Zurich's pretrial failure to provide the complete defense file. Zurich argues that some of the evidence was privileged, however, the trial court eventually fined Zurich for failing to provide this evidence, and Zurich paid that fine. Failure to provide this evidence was a discovery violation, however Zurich provided good faith reasons for its failure to provide the documents in question, and the issue was resolved by the trial court. A single discovery violation does not rise to the level of bad faith.[7] The insured may not base a bad faith or CPA claim on an insurer's good faith mistake. Werlinger v. Clarendon Nat. Ins. Co., 129 Wn. App. 804, 808, 120 P.3d 593 (2005).

C.     CPA and IFCA

Ledcor also asserts that Zurich violated the CPA and the IFCA. To successfully bring an action under the CPA, a private plaintiff must prove five elements: "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; and (5) causation." Ledcor Indus. (USA), Inc. v. Mut. of Enumclaw Ins. Co., 150 Wn. App. 1, 12, 206 P.3d 1255 (2009). A denial of coverage does not constitute an unfair or deceptive act or practice and does not violate the CPA as long as it is based on reasonable conduct of the insurer, even if the denial ultimately is proved incorrect. Overton, 145 Wn.2d at 417.

---

[7] Admiral Way and Ledcor make much of Zurich's attempt to recoup defense costs it paid in the COA lawsuit. In 2013, the Washington Supreme Court disallowed such reimbursement, holding "[d]isallowing reimbursement is most consistent with Washington cases regarding the duty to defend, which have squarely placed the risk of the defense decision on the insurer's shoulders." Nat'l Sur. Corp. v. Immunex Corp., 176 Wn.2d 872, 884, 297 P.3d 688 (2013). While reimbursement has been found to be unavailable, neither Admiral Way nor Ledcor make it clear how Zurich briefly requesting such reimbursement in 2009 contributes to a bad faith claim. There is no evidence that Zurich pursued these costs in an unreasonable or frivolous way, or that any damage arose out of this minor addition to Zurich's claim. Zurich also argues that Ledcor's counsel at one point offered to allow Zurich to cover defense costs.

The IFCA also does not create an independent cause of action for alleged regulatory violations in the absence of an unreasonable denial of coverage or benefits. Perez-Crisantos v. State Farm Fire & Cas. Co., 187 Wn.2d 669, 680, 389 P.3d 476 (2017). Since Ledcor did not demonstrate Zurich's actions were unreasonable or in bad faith, its extra-contractual claims against Zurich were properly dismissed.

## VSC

Ledcor next contends that the trial court erred in granting summary judgment and dismissing its claims against VSC. We agree.

Ledcor's CGL policy from VSC was effective December 1, 2003 to December 1, 2004. Ledcor tendered the COA's notice of construction defect to VSC on March 23, 2007. Cambridge Integrated Services Group, Inc., a third-party administrator of VSC, acknowledged receipt of the claim on April 13, 2007 and indicated it was investigating the matter. On May 16, 2007, VSC responded denying coverage based on several policy exclusions. After the COA filed its complaint, Ledcor re-tendered the matter to VSC on September 21, 2007. On July 20, 2009, VSC notified Ledcor that it would be sending a follow up letter agreeing to participate in Ledcor's defense under a reservation of rights. The subsequent letter was never sent. The COA's claim was resolved on July 28, 2009.

VSC moved for summary judgment in May 2010 seeking a declaratory judgment that it had no duty to defend Ledcor. At the same time, Ledcor moved for summary judgment against VSC. The trial court granted VSC's motion for summary judgment as to Ledcor and denied Ledcor's motion.[8]

---

[8] Relying on RAP 9.12, VSC moved to strike references in Ledcor's brief to materials not specifically listed in the trial court's order on summary judgment. Generally, "evidence called to the

-18-

A.    Duty to Defend

VSC maintains that it did not have a duty to defend nor indemnify under the "progressive, continuous or intermittent property damage exclusion" (progressive damage exclusion) and the "other insurance" clause of its policy. We disagree. We address each in turn, strictly construing the exclusion against VSC. Expedia, 180 Wn.2d at 803.

The progressive damage exclusion has three requirements. For the exclusion to apply, VSC was required to demonstrate that (1) the property damage "existed or commenced prior to the inception date of th[e] policy," or (2) "arose out of any damage, defect, deficiency, inadequacy or dangerous condition which existed prior to the inception date of th[e] policy," and (3) that the damage was included under the defined "Products—Completed Operations Hazard." Work under the Products—Completed Operations Hazard would be deemed completed: "When all of the work to be done at the job site has been completed" or "When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project."

Ledcor's CGL policy with VSC was effective December 1, 2003 to December 1, 2004. Thus, the progressive damage exclusion would exclude damage that existed or commenced, or arose out of a condition that existed, prior to December 1, 2003. The

attention of the trial court is properly before us, whether or not it was considered by the trial court." Goodwin v. Wright, 100 Wn. App. 631, 648, 6 P.3d 1 (2000). At the time the trial court considered VSC's motion it was also reviewing motions and cross motions related to Ledcor's claims against Zurich. Due to the complex nature of this case, we decline to apply RAP 9.12 in a manner that would assume that the trial court granted summary judgment for VSC in a vacuum without considering Ledcor's own summary judgment motion or any other evidence. The appellate "rules will be liberally interpreted to promote justice and facilitate the decision of cases on the merits. Cases and issues will not be determined on the basis of compliance or noncompliance with these rules except in compelling circumstances where justice demands." RAP 1.2. We deny VSC's motion to strike.

COA's complaint is vague about when the damage began. The complaint lists multiple claims of water intrusion damages and defects, and states "the property damage is continuous and ongoing throughout the Condominium. <u>Damage may have commenced at or shortly after the completion of each building or element of infrastructure, and may be continuing to the present.</u>"[9] Thus, the relevant date is the "completion" of each building. It is undisputed that the certificate of occupancy for The Admiral was issued by the City of Seattle on March 14, 2003, and sale of the condominiums began in April 2003. It is also undisputed that Ledcor and Admiral Way contractually agreed that The Admiral was not substantially complete until February 2004.

Strictly construing the exception against VSC, because the date of completion falls within the term of VSC's policy, VSC had a duty to investigate and give Admiral Way the benefit of the doubt. <u>Woo</u>, 161 Wn.2d at 53. Because a reasonable interpretation of the facts could result in coverage, the progressive damage exclusion does not apply.

The other insured condition in Ledcor's policy from VSC provides that the insurance is excess over "[a]ny other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement." And further,

> When this insurance is excess, we will have no duty under COVERAGES A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit." If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

Ledcor was listed as an additional insured under multiple insurance policies, and was being represented by two insurance companies that undertook its defense at no

---

[9] (Emphasis added.)

cost to Ledcor. However, there is no evidence that VSC investigated whether other insurers were "available" for Ledcor at the time of its initial denial, or that VSC even believed this provision applied when it denied Ledcor's claim. VSC did not rely on this provision in its denial, and VSC did not rely on this provision when it later suggested it would join the defense alongside the other carriers. If it is not clear from the face of the complaint that the policy provides coverage, but if coverage could exist, the insurer must investigate and give the insured the benefit of the doubt that the insurer has a duty to defend. Woo, 161 Wn.2d at 53. A question of fact remains whether VSC did the requisite investigation into whether other insurance was available for Ledcor before it denied coverage. Because there is at least a question of fact whether the progressive loss exclusion and other insurance provision apply, summary judgment and dismissal of Ledcor's claims against VSC was not appropriate.

B.   Extra Contractual Claims

Ledcor maintains that VSC acted in bad faith. At the outset, Washington courts have long held the "insured may maintain an action against its insurer for bad faith investigation of the insured's claim and violation of the CPA regardless of whether the insurer was ultimately correct in determining coverage did not exist." Coventry Associates v. Am. States Ins. Co., 136 Wn.2d 269, 279, 961 P.2d 933 (1998). Only if the alleged claim is clearly not covered by the policy is the insurer relieved of its duty to defend. Kirk, 134 Wn.2d at 561. The insured bears the burden of demonstrating the insurer acted in bad faith when it refused to defend its insured by demonstrating that refusal is "unreasonable, frivolous, or unfounded." Truck, 147 Wn.2d at 777; Smith, 150 Wn.2d at 486. The insurer is entitled to summary judgment "if reasonable minds could

not differ that its denial of coverage was based upon reasonable grounds." Smith, 150 Wn.2d at 486.

Ledcor retained a policy with VSC for primary general liability effective from December 1, 2003 to December 1, 2004. The Admiral was substantially completed on either April 2003, or February 2004. The original claim provided to VSC did not state a specific date as to when damages began, or when the defects developed. It can hardly be said that the alleged claim was "clearly not covered" by policy. "If the insurer is unsure of its obligation to defend in a given instance, it may defend under a reservation of rights while seeking a declaratory judgment that it has no duty to defend." Truck, 147 Wn.2d at 761. VSC should have done so in this case.

As discussed above, it appears that Ledcor may have been covered under VSC's CGL policy, and there remains at least a question of fact as to whether VSC reasonably investigated whether the two exclusions it relies upon actual excluded coverage. Dismissal of Ledcor's bad faith and CPA claim on summary judgment was erroneous.

### North Pacific

Ledcor next contends that the trial court erred in dismissing its claims against North Pacific for coverage under its policy with The Painters. We disagree.

A.    Additional Facts

The subcontract between Ledcor and The Painters required Ledcor be named as an additional insured on The Painters' insurance:

> 11.1 SUBCONTRACTOR' S INSURANCE. Prior to the start of the
> Subcontract Work, the Subcontractor shall procure for the Subcontract
> Work and maintain in force Workers' Compensation Insurance, Employer's
> Liability Insurance, Comprehensive Automobile Liability Insurance,
> Comprehensive or Commercial General Liability Insurance on an

occurrence basis, and any other insurance required of Subcontractor under the Subcontract.

. . . [T]he Contractor, Owner and other parties as required shall be named as additional insureds on each of these policies except for Workers' Compensation.

The Subcontractor's insurance shall include contractual liability insurance covering the Subcontractor's obligations under this Subcontract.

The Painters obtained a CGL policy from North Pacific for the policy period from

December 26, 2001, through December 26, 2002. The declarations did not name

Ledcor as an additional insured under the policy. The policy included an automatic

additional insured endorsement that provided:

AUTOMATIC ADDITIONAL INSUREDS
INCLUDING COMPLETED OPERATIONS TO THE EXTENT
REQUIRED BY AN INSURED CONTRACT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY
COVERAGE PART

The following is added to WHO IS INSURED (Section II):

1. To the extent it is required by the terms of an "insured contract" which requires you to add by endorsement as an additional insured or organization, WHO IS AN INSURED (Section II) is amended to include as an insured such person or organization ("additional insured") but only with respect to:

> (a) Vicarious liability arising out of <u>your ongoing operations</u> performed for the additional insured; or

> (b) Liability arising out of any act or omission of the additional insured for which you have entered into an enforceable "insured contract" which obligates you to indemnify the additional insured, or to furnish insurance coverage for the additional insured, and arising out of <u>your ongoing operations for that additional insured</u>.

With respect to the insurance afforded these additional insureds, the following additional exclusions apply:

-23-

2. This insurance does not apply to "bodily injury," or "property damage" occurring after:

(a) All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs), to be performed by or on behalf of the additional insured at the site of the coverage operations has been completed; or

(b) That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

This exclusion does not apply to the extent that an "insured contract" requires that you assume the tort liability of the additional insured arising out of a risk that would otherwise be excluded by this exclusion.[10]

Ledcor tendered the COA's claim to North Pacific on March 10, 2009. North Pacific did not respond. On May 24, 2010, Ledcor's counsel sent a 20-day notice letter under the IFCA, demanding that North Pacific defend and indemnify Ledcor for the underlying construction defect claims as an additional insured under The Painters' CGL policy. On May 28, 2010, North Pacific responded stating they had no record of the March 2009 tender, and that there was no coverage under The Painters' CGL policy because Ledcor was not identified as an additional named insured and the automatic additional insured endorsement only applied to "ongoing operations."

In June 2010, Ledcor amended its third-party complaint to name North Pacific as a third-party defendant, alleging claims for declaratory relief, breach of contract, breach of the obligation of good faith and fair dealing, bad faith refusal to defend, and IFCA and CPA violations.

---

[10] (Emphasis added.)

North Pacific subsequently moved for summary judgment and dismissal of Ledcor's third-party claims. On July 8, 2011, the trial court granted North Pacific's motion on each contractual and extra-contractual claim and dismissed North Pacific from the lawsuit.

B.    Duty to Defend

North Pacific contends that their policy with The Painters only provided automatic additional insured coverage for "ongoing operations" and not "completed operations." Consequently, because Ledcor was not a named additional insured, North Pacific had no duty to provide a defense to Ledcor as an additional insured because the operations performed by The Painters were completed operations. We agree with North Pacific.

North Pacific relies on this court's decision in Hartford Ins. Co. v. Ohio Cas. Ins. Co., 145 Wn. App. 765, 778, 189 P.3d 195 (2008), where we concluded that the term "ongoing operations" was an express coverage limitation in the policy and endorsement language that was intended to avoid "broad coverage for an additional insured." Specifically, we held "ongoing operations" language excludes "completed operations" coverage and limits coverage to the "subcontractors' work in progress only." Hartford, 145 Wn. App. at 778. The plain language of the North Pacific policy contains this same limitation.

Section one of the "additional insured" endorsement in The Painters' policy limits additional insured coverage to when it "is required by the terms of an 'insured contract'" and includes as an insured such person or organization "only with respect to: (a) Vicarious liability arising out of your ongoing operations performed for the additional insured; or (b) Liability arising out of any act or omission of the additional insured . . .

arising out of your ongoing operations for that additional insured."[11] Thus, as in Hartford, the plain language of the first section explicitly limits coverage to "ongoing operations." See Absher Const. Co. v. N. Pac. Ins. Co., 861 F. Supp. 2d 1236, 1244 (W.D. Wash. 2012) (considering a similar North Pacific policy).

The COA's complaint in the underlying action alleged damages occurring after completion of the buildings, long after the Painters ceased their "ongoing operations." Accordingly, we agree with the trial court that the policy did not cover those claims and North Pacific's denial of a defense and coverage based on this language was not "unreasonable, frivolous, or unfounded." We affirm summary judgment.

## Transportation

Ledcor next contends that the trial court erred in dismissing its claims against Transportation[12] based on the policy Transportation provided subcontractor SQI. We agree.

Ledcor contracted with subcontractor SQI to install a roofing system. Transportation issued policies to SQI for the period from May 1, 2000 to May 1, 2003. It is undisputed that SQI was required to name Ledcor as an additional insured under those policies. Paragraph 11.1 of the subcontract between Ledcor and SQI is the same as the subcontract with The Painters, and describes the requirements that SQI name certain parties as additional insureds:

> 11.1 SUBCONTRACTOR'S INSURANCE. Prior to start of the
> Subcontract work, the Subcontractor shall procure for the Subcontract
> Work and maintain in force Workers' Compensation Insurance,
> Employer's Liability Insurance, Comprehensive Automobile Liability
> Insurance, Comprehensive or Commercial General Liability Insurance on
> an occurrence basis, and any other insurance required of Subcontractor

---

[11] (Emphasis added.)
[12] Ledcor refers to the Transportation Insurance Company as CNA.

under the Subcontract. If required by the Subcontract Documents, the Contractor, Owner and other parties as required shall be named as additional insureds on each of these policies except for Workers' Compensation. The Subcontractor's insurance shall include contractual liability insurance covering the Subcontractor's obligations under this Subcontract.[13]

Paragraph 11.2 of the subcontract states the "Subcontractor's Comprehensive or Commercial General Liability Insurance and Comprehensive Automobile Liability Insurance, as required by Paragraph 11.1, shall be written with limits of liability not less than the following: . . .

A. Comprehensive General Liability Insurance including completed operations:

1. Combined Single Limit Bodily Injury and Property Damage: $1,000,000 Each Occurrence $ 2,000,000 Aggregate

or

2. Bodily Injury: $ 1.000,000 Each Occurrence $ 2,000,000 Aggregate
3. Property Damage: $ 1,000,000 Each Occurrence $ 2,000,000 Aggregate

B. Commercial General Liability Insurance
1. Each Occurrence Limit: $ 1,000,000
2. General Aggregate: $2,000,000
3. Products/Completed Operations Aggregate: $2,000,000. . ."[14]

Paragraph 11.4 states the requirements for what insurance policies the subcontractors must obtain, and provisions for cancellation and renewal of those policies. This paragraph includes the requirement that "The Subcontractor shall maintain completed operations liability insurance for one year after acceptance of the Subcontract Work, substantial completion of the Project, or to the time required by the Subcontract Documents, whichever is longer." The Subcontractor shall furnish the

---

13 (Emphasis added.)
14 (Emphasis added.)

Contractor evidence of such insurance at the time of completion of the Subcontract Work.

The issue is whether Ledcor, as an additional insured under SQI's policy with Transportation, had completed operations coverage. Of the three annual policies that Transportation issued to SQI, only the third (May 1, 2002 through May 1, 2003) contains an endorsement addressing completed operations. The policy includes an endorsement that modifies the "commercial general liability coverage." The endorsement provides an additional-insured coverage for completed operations only if that coverage is required by written contract:

> The coverage provided to the additional insured by this endorsement and paragraph f. of the definition of "insured contract" under DEFINITIONS (section V) do not apply to "bodily injury" or "property damage" arising out of the "products-completed operations hazard" unless required by the written contract or written agreement.[15]

Under the policies, "products-completed operations hazard,"

> a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
> (1) Products that are still in your physical possession; or
> (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
> (a) When all of the work called for in your contract has been completed.
> (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
> (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

---

[15] (Emphasis added).

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.[16]

In construing a written contract, a court will not read an ambiguity into a contract that is otherwise clear and unambiguous. Mayer v. Pierce County Med. Bureau, Inc., 80 Wn. App. 416, 420, 909 P.2d 1323 (1995). When interpreting a contract, the contract will be given a practical and reasonable interpretation that fulfills the object and purpose of the contract rather than a strained or forced construction that leads to an absurd conclusion, or that renders the contract nonsensical or ineffective. Washington Pub. Util. Districts' Utilities Sys. v. Pub. Util. Dist. No. 1 of Clallam County, 112 Wn.2d 1, 11, 771 P.2d 701 (1989). Transportation's interpretation of the contract asks us to do just that.

Paragraph 11.1 of the subcontract required that SQI obtain several forms of insurance, including "Comprehensive or Commercial General Liability Insurance on an occurrence basis." The subcontractor was also to name "the Contractor, Owner and other parties . . . as additional insureds on each of these policies." It is undisputed this paragraph fulfills the requirement of requiring Ledcor to be named as an additional insured.

Paragraph 11.2 provided the minimum limits of liability for "The Subcontractor's Comprehensive or Commercial General Liability Insurance and Comprehensive Automobile Liability Insurance, as required by Paragraph 11.1." This reference back to 11.1 is not a limitation, but merely referencing that "Comprehensive or Commercial General Liability Insurance" had been required in 11.1. The minimums required under paragraph 11.2 for CGL insurance include a "product/completed operations aggregate

---

16 (Emphasis added.)

of $2 million. Because paragraph 11.1 required CGL insurance, paragraph 11.2 required the insurance include completed operations coverage.

In addition, paragraph 11.4 of the subcontract provided the coverage time limits required under the contract. 11.4 includes the requirement that the Subcontractor shall "maintain in effect all insurance coverage required under this Subcontract," and that the "Subcontractor shall maintain completed operations liability insurance for one year after acceptance of the Subcontract Work, substantial completion of the Project, or to the time required by the Subcontract Documents, whichever is longer."[17]

When read together, and giving effect to paragraphs 11.1, 11.2, and 11.4, SQL's subcontract required Ledcor to be named as an additional insured on the CGL policy, required the CGL policy to include completed project coverage, and required the coverage extend through the term of the CGL policies issued by Transportation. The trial court erred in granting summary judgment and dismissing Ledcor's claims against Transportation.

### FMIC

Ledcor contends next that the trial court erred in dismissing its direct claims against third party FMIC, another insurer for subcontractor SQI. We disagree.

We first address whether Ledcor was covered under the policies issued by FMIC to SQI. FMIC issued a CGL policy from May 1, 2006 to May 1, 2007. That policy was subsequently renewed from May 1, 2007 to May 1, 2008. Both policies contained separate endorsements for ongoing operations and completed operations. Both policies also contain nearly identical "additional insured ongoing operations" endorsements. That endorsement provides as follows:

---

[17] (Emphasis added.)

A. Section II - Who Is An Insured is amended to include as an additional insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

    1. Your acts or omissions; or

    2. The acts or omissions of those acting on your behalf;
in the performance of your <u>ongoing operations</u> for the additional insured.

A person's or organization's status as an additional insured under this endorsement <u>ends when your operations for that additional insured are completed.</u>

. . .

B. With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:
This insurance does not apply to:
. . .

    2. "Bodily injury" or "property damage" occurring after:

        a. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

        b. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.[18]

Thus, the only question is whether SQI was engaged in any "ongoing operations" for the additionally insured—Ledcor—at the time the original policy began on May 1,

---

[18] (Emphasis added).

2006. It is undisputed that SQI's final maintenance at The Admiral concluded on May 10, 2005. Ledcor does not argue any other "ongoing operations" were continuing at that time, nor provide any evidence that further operations took place during that period. The contract unambiguously provides, "A person's or organization's status as an additional insured under this endorsement ends when your operations for that additional insured are completed." Consequently, Ledcor has not demonstrated that it qualifies as an additional insured for ongoing operations under either policy.

Turning to the completed operations endorsement, the 2006 to 2007 and 2007 to 2008 policies differ. The 2006 to 2007 policy specifically identifies each entity covered as an additional insured for completed operations. Ledcor was not identified as an additionally insured for completed operations on the 2006 to 2007 policy. Ledcor offered no evidence to the contrary.

The 2007 to 2008 policy, however, includes an additional listing for: "Any person or organization, . . .to whom or to which the Named Insured is obligated, by virtue of written contract to provide Insurance, such as is afforded by this policy."[19]

The same Ledcor and SQI subcontract is at issue here as in the claims brought against Transportation. As discussed above, when read together, paragraphs 11.1, 11.2, and 11.4 required SQI to maintain completed operations coverage and identify Ledcor as an additionally named. SQI's obligation, however, was limited in time. Paragraph 11.4 of the subcontract requires that: "The Subcontractor shall maintain completed operations liability insurance for one year after acceptance of the Subcontract Work, substantial completion of the Project, or to the time required by the Subcontract Documents, whichever is longer." Under this provision, the latest

---

[19] (Emphasis added.)

reasonable interpretation of this provision is May 2006, one year after SQI performed maintenance on The Admiral.

We hold that Ledcor was not an additionally insured under the policy issued to SQI by FMIC. In addition, because Ledcor was not covered as an additional insured under the policies, Ledcor has failed to demonstrate that FMIC's denial of coverage was "unreasonable, frivolous, or unfounded." Overton, 145 Wn.2d at 433.

*Ledcor's Assigned Claims Against FMIC*

SQI assigned its direct claim against FMIC to Ledcor. Ledcor asserts finally that the trial court erred in dismissing its assigned claims against FMIC. We disagree.

A.    Additional Facts

On August 29, 2008, while the COA's construction defect action was pending, Ledcor filed a separate lawsuit against all subcontractors involved in The Admiral project (subcontractor action). SQI was named in the subcontractor action. The subcontractor action sought to recover against the subcontractors any amounts that Ledcor was ultimately obligated to pay to the COA.

SQI tendered that lawsuit to FMIC seeking defense and indemnity as a Named Insured under the FMIC Policies. FMIC agreed to defend SQI pursuant to a reservation of rights. One of SQI's other insurers, Cornhusker Insurance Company (Cornhusker), also agreed to participate in SQI's defense. Cornhusker and FMIC jointly provided SQI with a fully funded and complete defense. Ledcor sent a settlement demand letter in March 2014. Beginning in February 2014, FMIC participated in mediations and offered to contribute to settlement demands on behalf of SQI. No settlement was reached at

this time. After the mediations failed to reach a settlement, FMIC sent letters requesting updates on the settlement negotiations.

On April 8, 2014, FMIC was informed by the assigned defense counsel that SQI, through its personal counsel, had reached a settlement agreement with Ledcor. On April 11, 2014, FMIC was provided with a copy of the consent judgment that was entered against SQI in the subcontractor action. The consent judgment indicated that it was filed in compliance with a March 21, 2014 settlement agreement between Ledcor and SQI. FMIC sent a follow up letter requesting information about the letter, and expressing concern that it had not been included in the settlements, or been asked to contribute to the settlement. After entering into the consent judgment settlement, Ledcor pursued all contractual and extra-contractual causes of action against FMIC as the assignee of SQI.

In November 2013, FMIC filed a declaratory judgment action in federal court seeking a judicial determination that it was not obligated to cover SQI in the subcontractor action. After the case was remanded to the King County Superior Court, FMIC was granted leave to file a third-party complaint in this action seeking declaratory judgment against SQI. SQI (through Ledcor) responded adding counter claims for breach of duty, bad faith, and violations of the CPA and the IFCA.

On October 28, 2016, the trial court granted FMIC's motion for summary judgment dismissing SQI/Ledcor's counter claims. On October 31, 2016, the court granted FMIC's motion for summary judgment agreeing that the policy FMIC issued to SQI was not applicable, and even if it were, the continuous or progressive injury or

damage exclusion barred recover. The trial court subsequently denied Ledcor's motions for reconsideration.

B.    <u>Duty to Defend</u>

The FMIC policy issued to SQI provides coverage for "property damage" caused by an "occurrence" during the FMIC policy period, so long as the insured does not know, in whole or in part, about the "property damage" or any continuation, change, or resumption of such "property damage" prior to the inception of the FMIC policy. Specifically, the policy states,

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .

   b. This insurance only applies to "bodily injury" and "property damage" only if:

      1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

      2) The "bodily injury" or "property damage" <u>occurs during the policy period</u>; and

      3) Prior to the policy period, no insured listed under Paragraph 1 of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, <u>knew that the "bodily injury" or "property damage" had occurred, in whole or in part</u>. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then <u>any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.</u>

        . . .

   d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

      1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.[20]

As discussed above, in determining coverage, this court considers a two-step process. First, the insured must establish that the loss falls within the "scope of the policy's insured losses." Then, the burden shifts to the insurer to show that the loss is excluded by specific language in the policy. Diamaco, 97 Wn. App. at 337. Although this policy uses exclusionary language, the burden is still on SQI to demonstrate the damage took place during the coverage period, and that SQI did now know of the damage before the policy period.

FMIC provided substantial evidence that SQI knew, at least in part, that the damage to the roofing had occurred at The Admiral as of at least 2004. FMIC further provided evidence that SQI failed to repair the damage that it was asked to repair in 2005, and that some of the claims arose of that damage. SQI only presented evidence that SQI may have believed that they had fixed all of the damage when they returned to do further maintenance in 2005.[21] Moreover, the evidence showed the damage occurring after 2005 would have been a "continuation, change or resumption" of the original damages.[22] Because there is no reasonable dispute that SQI knew of the damages before it purchased the FMIC policies in 2006 and in 2007, summary judgment was appropriate concluding that SQI's damages were not covered under the FMIC policies.

---

[20] (Emphasis added.)

[21] Ledcor cites several cases considering the common law "known loss" principal, however these cases do not support his argument. See Pub. Util. Dist. No. 1 of Klickitat County v. Int'l Ins. Co., 124 Wn.2d 789, 806, 881 P.2d 1020 (1994).

[22] (Emphasis added.)

C.    Extra Contract Claims

Again, to succeed on a bad faith claim, the policyholder must show the insurer's breach of the insurance contract was unreasonable, frivolous, or unfounded. Overton, 145 Wn.2d at 433. "The insured may not base a bad faith or CPA claim on an insurer's good faith mistake, which occurs when the insurer acts honestly, bases its decision on adequate information, and does not overemphasize its own interest." Werlinger, 129 Wn. App. at 808.

Here, based on the allegations in the subcontractor action, FMIC accepted the defense of SQI under a reservation of rights. FMIC then assigned counsel, participated in settlement negotiations, and finally brought a declaratory relief action. SQI did not pay any defense fees or incur damages. FMIC did not act in bad faith in its defense of SQI. See Truck, 147 Wn.2d at 761.

SQI also raised various CPA violations, including that FMIC failed to investigate its claims, and again that FMIC "commingled" the coverage and defense claims. Even if these actions rise to the level of "(1) unfair or deceptive act or practice," under the CPA, there is no presumption of harm. SQI needed to prove it was harmed by FMIC's actions, and SQI did not present evidence of harm. SQI did not pay defense fees or incur any costs.

Finally, in the absence of an unreasonable denial of coverage or benefits, the IFCA does not create an independent cause of action for alleged regulatory violations. Perez-Crisantos, 187 Wn.2d at 680.

Summary judgment and dismissal of Ledcor's assigned claims against FMIC was appropriate.

No. 76490-0-I/38

We reverse the dismissal of Ledcor's claims against VSC and Transportation. We affirm in all other respects.

WE CONCUR:

_____
Mann, A.C.J.

_____
Trickey, J.P.T.

_____